UNITED STATES OF AMERICA,

Plaintiff,

v.                                    Case No. 25-CR-064

JOSE ANGEL HERNANDEZ-PINEDA,

Defendant.

## GOVERNMENT'S RESPONSE TO
## DEFENDANT'S SUPPRESSION MOTION

The United States of America, by its attorneys, Richard G. Frohling, Acting United States Attorney for the Eastern District of Wisconsin, and Timothy W. Funnell, Assistant United States Attorney, hereby responds to Hernandez-Pineda's motion to suppress evidence. (Dkt. 13). For the following reasons, the motion should be denied.

## I.    Statement of the Case

### A.    The indictment and the suppression motion

Hernandez-Pineda faces three counts: possessing 500 grams or more of cocaine with intent to distribute, possessing a firearm in furtherance of drug trafficking, and possessing a firearm as an illegal alien, all arising from March 7, 2024, when he and J.P.C.[1] traveled from Chicago to Green Bay in a red Audi. (Dkt. 7.) After he dropped off J.P.C., he drove to an apartment building at 2080 Verlin Road. He left and made several stops, including JBS (a meat-processing facility), where he conducted a suspected hand-to-hand drug deal. He returned to 2080 Verlin Road, where

---

[1] The full names of J.P.C. and D.M. were used during the suppression hearing.

agents approached him and—using a ruse about a missing child to protect a broader drug investigation—requested consent to search the Audi and whatever apartment he resided in. (Dkt. 19 at 17-39, 74-77.) He repeatedly denied living there, but later led agents to Apartment 14. Agents found a knotted-corner baggie in the Audi, and inside Apartment 14, they found 2.4 kilograms of cocaine, a .40-caliber Glock pistol, three Glock magazines—two loaded with 15 and 10 rounds, and two boxes containing 74 rounds of .40-caliber ammunition. (Dkt. 7; 19 at 43, 53, 87-88; see also Dkt. 1 (Criminal Complaint) at 5-7, EDWI Case No. 25-MJ-602.)

After seizing the cocaine, pistol, magazines, and ammunition, agents arrested Hernandez-Pineda, transported him to the police station, and advised him of his *Miranda* rights in Spanish, which he waived. (Dkt. 1 at 5-7 (25-MJ-602).) He admitted that in the past several months, he had no legitimate income but was buying cocaine for $18,500 per kilogram, and in the past six months, he distributed about 10 kilograms of cocaine in Brown County. (*Id.*) He did this while living in the United States as an illegal alien, so he was prohibited from possessing firearms and ammunition at all, let alone in furtherance of drug trafficking. (*Id.*; see also Dkt. 7.)

Hernandez-Pineda challenges the apartment search and its fruits, alleging that his consent was not valid and that the search exceeded the scope of any consent. (Dkt. 13.)

### B.      Evidence adduced at the suppression hearing

On June 11, 2025, the Court held an evidentiary hearing on the motion. Despite having repeatedly denied living at the apartment, and the government notifying him that he would be required to establish his expectation of privacy,[2] Hernandez-Pineda did not testify or present an affidavit on the issue. The government's evidence included the following witnesses and exhibits:

- Investigator Nick Ronsman, Brown County Drug Task Force ("BCDTF")

---

[2] Before the hearing, the government notified the defense that Hernandez-Pineda would need to demonstrate his expectation of privacy. At the close of evidence, the Court asked if the government disputed standing, and the government responded affirmatively. (Dkt. 19 at 124.)

- Special Agent Patrick Beckman, Drug Enforcement Administration ("DEA"), Green Bay Office

- Detective Benjamin Harvath, Green Bay Police Department (formerly with BCDTF)

- Task Force Officer Irvin Benitez, DEA (IL) and Rockford (IL) Police Department

- WhatsApp screenshots from Inv. Ronsman's phone showing agents' messages to each other during their pre-search surveillance of J.P.C. and Hernandez-Pineda on 3/7/2024 (Exh. 1)

- A consent-to-search form signed by Hernandez-Pineda and Det. Harvath inside Apartment 14 on 3/7/2024 (Exh. 2)

- Two pre-search surveillance videos taken by Inv. Ronsman on 3/7/2024 (Exhs. 3 & 4)

- Three bodycam videos taken by Inv. Ronsman (Exh. 5) and Inv. Waeghe (Exhs. 6 & 7) before and during the search of Apartment 14 on 3/7/2024

- The lease for Apartment 14 in the name of J.P.C. (Exh. 8)

- A photo of a knotted-corner baggie that agents found on the Audi's floorboard before searching Apartment 14 on 3/7/2024 (Exh. 9)

(Dkt. 19.)

Hernandez-Pineda introduced three exhibits, each one a transcript from the bodycam audios that the government introduced: Exh. 1001 (corresponding to Exh. 5); Exh. 1002 (corresponding to Exh. 6); and Exh. 1003 (corresponding to Exh. 7).[3]

According to the testimony, on March 7, 2024, DEA-Chicago alerted SA Beckman that occupants of a red Audi had engaged in bulk-cash smuggling and were returning to Green Bay. (Dkt. 19 at 7, 35, 73-75.) DEA-Chicago's investigation was ongoing, so it instructed Beckman not

---

[3] As defense counsel indicated, the transcripts are aids to the Court, but the videos are the actual evidence. (Dkt. 19 at 4.) There are instances, such as those indicated by underlining below, where the government believes that the bodycam audio differs from the defense's interpretation. The Court, as fact finder, can resolve these and other discrepancies that it discerns between the bodycams and transcripts.

to disclose the drug-related origin of the tip. (Dkt. 19 at 38, 75.) To comply with that request, Beckman and other agents decided to surveil Hernandez-Pineda and ultimately approach him using a ruse that a similar Audi was seen in Manitowoc County where a child was reported missing two weeks earlier on 2/20/2024. (Dkt. 19 at 38-39, 74-77.)

Agents located the Audi on the highway traveling northbound and followed it to Willow Park Apartments on University Avenue in Green Bay, where they watched one of its occupants go inside at about 1:16PM. (Dkt. 19 at 17, 19; Exh. 1.) Agents were familiar with Willow Park from prior drug-trafficking investigations, including one on 10/23/2023, where a Toyota 4Runner registered to J.P.C. returned there after supplying cocaine to D.M. (Dkt. 19 at 12-27; Exh. 1.)

During the 10/23/2023 investigation, agents used an informant to buy ¼ ounce of cocaine from D.M. (Dkt. 19 at 12-13.) D.M. agreed to supply another ounce of cocaine but needed to contact his source to get it. (Dkt. 19 at 13-14.) As agents followed D.M., he contacted the informant asking for the money to be "fronted." (Dkt. 19 at 13-16.) The informant refused, but D.M. had enough to buy ½ ounce, so they agreed to meet after D.M. obtained it. (*Id.*) Agents—including Inv. Ronsman—watched D.M. park near a grocery store, walk to a Toyota 4Runner registered to J.P.C., and make a quick hand-to-hand exchange with someone inside. (*Id.*) Ronsman testified that based on his training and experience, these events were consistent with a drug deal. (*Id.*) His suspicion was confirmed when agents subsequently stopped D.M.'s car and seized ½ ounce of cocaine. (*Id.*) Two months later, in December 2023, agents conducted a traffic stop of the same Toyota 4Runner and identified J.P.C. as the driver. (*Id.*)

Returning to the events of 3/7/2024, agents who followed the Audi to Willow Park knew about the 10/23/2023 investigation, and they suspected that J.P.C.—D.M.'s likely cocaine source from 10/23/2023—was the occupant of the Audi who entered Willow Park on 3/7/2024. Seeking confirmation, agents used their WhatsApp group-chat to ask intelligence analyst Cal Shanle (who

was at the station monitoring the group-chat) for historical information on J.P.C. (Dkt. 19 at 21-22; Exh. 1.) Shanle responded with J.P.C.'s booking photo and Wisconsin driver's license, which allowed agents to confirm that J.P.C. was the occupant of the Audi who Hernandez-Pineda dropped off at Willow Park on 3/7/2024. (*Id.*)

Hernandez-Pineda—now the sole occupant of the Audi—drove from Willow Park with agents following him. Agents again used their WhatsApp group-chat to ask analyst Shanle for information on prior traffic stops for the Audi. (Dkt. 19 at 23; Exh. 1.) Shanle responded with screenshots from a stop on 1/17/2024 where Hernandez-Pineda was driving and gave an address of 2080 Verlin Road, Apartment 14, Bellevue. (*Id.*) As agents continued to follow the Audi, Hernandez-Pineda drove to 2080 Verlin Road at about 1:32PM, parked inside a detached garage, and entered the common door for apartments 9 to 16, but agents couldn't tell which apartment he accessed. (Dkt. 19 at 23-26; Exh. 1.)

Investigator Ronsman continued his surveillance at 2080 Verlin Road, and at 2:47PM he saw—and took videos of—Hernandez-Pineda exiting the building, backing the Audi out of the garage, and driving to the parking lot of JBS—a nearby meat-processing facility—where Hernandez-Pineda conducted a suspected hand-to-hand drug deal with an unknown male who walked to the Audi's driver-side window. (Dkt. 19 at 28-36; Exhs. 3 & 4.) Ronsman testified that his suspicion was based not only on the nature of the exchange, but the prior investigation from 10/23/2023 involving J.P.C., who Hernandez-Pineda had traveled with from Chicago and dropped off at Willow Park apartments, and the tip from DEA-Chicago that the Audi's occupants had taken bulk currency to Chicago. (Dkt. 19 at 35.) Because the unknown male at JBS who did the suspected hand-to-hand drug deal with Hernandez-Pineda wasn't the focus of the investigation, agents continued to watch Hernandez-Pineda as he drove to a couple other locations in Green Bay before returning to 2080 Verlin Road at about 4:10PM. (Dkt. 19 at 35-37; Exh. 7 at 16:10.)

This time, Hernandez-Pineda pulled the Audi into an outside stall near a common entry door. (Dkt. 19 at 37; Exh. 7 at 16:10.) He stayed inside the Audi, which was approached by Inv. Waeghe, whose bodycam was activated and who knocked on the trunk to get Hernandez-Pineda's attention. (Dkt. 19 at 38; Exh. 7 at 16:10.) Hernandez-Pineda exited the Audi while speaking on his phone, leaving the driver's door open, and, without a request from Waeghe, raised his arms and turned around as though he expected to be patted down. (*Id.*) Waeghe did so, finding no weapons and making no seizures. (*Id.*)

Waeghe identified himself as "with the Sheriff's Office" and started explaining that he wanted to talk to Hernandez-Pineda about a missing child. SA Beckman approached as well; both agents were in plainclothes with vests marked "Police." (Dkt. 19 at 64-5; Exh. 7 at 16:11; Exh. 1003 at 1-2.)[4] During the approximate 21-minute period that agents were in the parking lot with Hernandez-Pineda before searching the apartment, they spoke in a conversational tone, with Hernandez-Pineda walking around freely, sometimes several feet away from agents, and he was never handcuffed or told that he was detained or under arrest. (Dkt. 19 at 83, 109; Exh. 7 (Waeghe first approaches the Audi at 16:10); Exh. 5 (Hernandez-Pineda and agents walk to the apartment building at 16:31); see generally Exhs. 5-7).) Although agents instructed him to put his phone down and not call anyone, they did so for officer safety, not knowing if he was calling someone who may come out of the building or otherwise come to the parking lot, particularly if he was speaking on the phone in Spanish. (Dkt. 19 at 40-41, 85.) Except for a brief period when his phone was in Beckman's possession, it remained with Hernandez-Pineda or accessible to him on the Audi's trunk, where he grabbed it when leading agents into the apartment. (Exh. 7 at 16:10, 16:18,

---

[4] Harvath and Ronsman were in plainclothes as well, and Harvath also wore a vest marked "Police."

& 16:31; Exh. 6 at 16:28; Exh. 19 at 82-83).[5] The keys to the Audi and the apartment stayed in the Audi until Hernandez-Pineda led agents inside. (Exh. 6 at 16:31 (Waeghe fetches them, gives them to Ronsman, who tosses them to Harvath, who hands them to Hernandez-Pineda.) Agents did not keep Hernandez-Pineda's identification either, returning it within about five minutes after Waeghe took a picture of it. (Exh. 7 at 16:13 & 16:18.)

Agents on scene—including Waeghe, Beckman, and later Ronsman and Harvath—did not speak Spanish. Hernandez-Pineda said that he did not speak English, but the videos and transcripts show him conversing with agents in English for several minutes before Beckman got a translator on the phone. (Dkt. 19 at 85-83; see, e.g., Exh. 7 at 16:10-16:14.) From that point, Hernandez-Pineda went between languages, speaking Spanish with the translator and English with on-scene agents. (See generally Exh. 5; Exh. 1001.)

When Waeghe and Beckman initially spoke to Hernandez-Pineda, they asked for his name, if anyone else was in the car, and said that a red Audi like his may have been involved in a missing-child investigation from Two Rivers. (Exh. 7 at 16:10-16:12; Exh. 1003 at 1-2.) His answers were responsive to their questions and statements, saying his name was "Jose," volunteering to "get my ID," clarifying the Audi belonged to his "girlfriend," and denying any involvement, saying, "I have never driven to Two Rivers." (*Id.*) When Waeghe followed up by asking for his identification, he replied, "You've got my ID"—thinking that he had already turned it over—but Waeghe corrected him, saying, "You never gave it." Hernandez-Pineda acknowledged this, saying "Oh yeah," pulling it from his wallet, and giving it to Waeghe. (Exh. 7 at 16:13; Exh. 1003 at 3-4.)

---

[5] Hernandez-Pineda possessed two phones on 3/7/2024. (Dkt. 19 at 82-83.) He was speaking on one phone when he exited the Audi. His second phone stayed in the Audi's driver's door compartment except when agents placed it briefly on the driver's seat before putting it back. (Exh. 7 at 16:14 & 16:16.)

Regarding the missing-child ruse, Beckman testified they did not intend to convey to Hernandez-Pineda it was an "emergency in any way." (Exh. 19 at 77.) Beckman testified that instead, they made "clear with him that it was not a life and death situation." (Exh. 19 at 77.) Indeed, Beckman told him that Beckman had "been doing this shit for like for three weeks and I'm just running around wasting my time." (Exh. 7 at 16:13; Exh. 1003 at 4.) Beckman also testified that he "apologized numerous times" to him and "tried to relay to him that our involvement with him would be quick," "we would only be there for a short time," and "we wanted to get the search done quickly so we could leave." (Exh. 19 at 77; Exh. 7 at 16:10-16:13; Exh. 1003 at 2.)

When Beckman mentioned to Hernandez-Pineda that agents wanted to search his apartment, he denied living there. (Exh. 7 at 16:10-16:14.)[6] This exchange began with Beckman and Hernandez-Pineda standing next to the Audi's trunk, and Beckman explaining the Audi's possible connection—based on its red color and two license-plate digits—to the missing-child investigation. Hernandez-Pineda consented to the Audi's search twice: first, while standing near the trunk (saying, "yeah that's ok"); and second, after walking a few feet away with Beckman, Waeghe approaches to ask for confirmation to search the Audi and that they would find "nothing related to that." (saying, "yeah" and nodding). (*Id.*)

> SA BECKMAN:  We'll get out of your hair. Listen, we've been running around all . . . for the last three weeks . . . when that kid was missing.
>
> HERNANDEZ-PINEDA:  No . . .
>
> SA BECKMAN:  That little kid, that three-year-old. He's been missing for like three, four weeks.
>
> HERNANDEZ-PINEDA:  No, I don't know.
>
> (loud idling engine sound)

---

[6] As noted above, where the government believes that the bodycam audio is different from the defense's interpretation in the transcript, the differences are indicated by underlining.

SA BECKMAN:  Is that off?

HERNANDEZ-PINEDA:  Yeah, I think it's off.

SA BECKMAN:   Oh okay. Um . . . you haven't heard of that kid in Two Rivers?

HERNANDEZ-PINEDA:  No.

SA BECKMAN:  That three-year-old boy.

HERNANDEZ-PINEDA:  I have never driven to Two Rivers.

SA BECKMAN:  Okay, well he got . . . well, he's probably dead, but he got kidnapped or killed three weeks ago. And so, like they're having everybody on the planet. If anybody calls in anything, they're like, you gotta follow up on it. Right?

HERNANDEZ-PINEDA:  Yeah.

SA BECKMAN:  And so red Audi with the first two *(points to the license plate)* . . .

HERNANDEZ-PINEDA: <u>Yeah shit, whatever</u> (inaudible)

SA BECKMAN:  . . . first two . . . license . . . they're like, hey, if anybody sees this, just . . .

HERNANDEZ-PINEDA:  Yeah.

SA BECKMAN:  You know, they may know something or there may be something up. Obviously, I can't do everything about it but . . .

HERNANDEZ-PINEDA:  Yeah.

**SA BECKMAN:  We just need to check this [the Audi] quick . . .**

**<u>HERNANDEZ-PINEDA: Yeah that's ok.[7]</u>**

**SA BECKMAN: . . . and check your apartment real quick and then we'll get out of here. Okay? So . . .**

**HERNANDEZ-PINEDA:  Oh no this . . . my apartment not here. It's not here.**

**SA BECKMAN:  Where's your apartment?**

---

[7] In addition to the audio, SA Beckman—who was a party to the conversation—testified that Hernandez-Pineda said something like, "Yeah, that's ok." (Dkt. 19 at 80.)

**HERNANDEZ-PINEDA:  <u>Over there (pointing). Okay,</u> in the . . .**

**SA BECKMAN:  Do you stay here? I mean you pulled in here.**

**HERNANDEZ-PINEDA:  No, no. Driving in the <u>for my day</u> with my girl.**

**SA BECKMAN:  Who stays here?**

**HERNANDEZ-PINEDA:  Who take me? No, just only driving here.**

SA BECKMAN:  Well, he's going to check your car real quick . . .

NI WAEGHE:  Yeah.

SA BECKMAN: So come over here and talk to me.

NI WAEGHE:  Do you have an ID or anything?

HERNANDEZ-PINEDA: Huh?

NI WAEGHE:  Do you have an ID?

HERNANDEZ-PINEDA: Yeah, you got my ID.

NI WAEGHE:  No. You never gave it.

HERNANDEZ-PINEDA:  Oh yeah.

NI WAEGHE:  Thanks.

SA BECKMAN:  Um, so if you don't live here, then why are you pulling in here?

HERNANDEZ-PINEDA:  No, because my. . . (mostly inaudible, speaking fades)

SA BECKMAN:  Come over here because . . .

(inaudible, distance speaking)

SA BECKMAN:  I've been doing this shit for like for three weeks and I'm just running around wasting my time. Okay. And I . . . it's like they're giving us these leads and I have to follow up on them. I'm very sorry for inconveniencing you.

NI WAEGHE:  Yeah (audible chuckling), sorry man.
(audible soft idling engine)
(inaudible distant conversation)

**HERNANDEZ-PINEDA:  My . . . my . . . nephew, over there.**

HERNANDEZ-PINEDA: **For da parking . . . there . . . it's over there . . . because . . . over there . . . I don't know where the apartment.**

SA BECKMAN: So, you . . . you

SA BECKMAN: You can go ahead and search that.

NI WAEGHE: I can search the car and nothing related to that?

<u>HERNANDEZ-PINEDA: Yeah (nodding).</u>[8]

NI WAEGHE: Okay.

(Exh. 7 at 16:10-16:14; Exh. 1003 at 2-4) (emphasis added).

Waeghe began a comprehensive search of the Audi's passenger compartment and trunk, joined by Harvath and Ronsman. Waeghe found a knotted-corner baggie on the floorboard behind the driver's seat, which, as Ronsman testified, is typically used to package drugs and "very common with drug dealing and drug use." (Exh. 9; Dkt. 19 at 43.) For about seven minutes, as agents searched the Audi, Hernandez-Pineda talked to Beckman or walked alone nearby while Beckman contacted a translator. Hernandez-Pineda was able to watch agents search the Audi, and at one point, Waeghe stopped to ask if he "shoots deer" or does "bird hunting"; Hernandez-Pineda walked closer and replied "no." (Exh. 7 at 16:15; Exh. 1003 at 4-5.)

Because Hernandez-Pineda told Beckman that he didn't understand English, Beckman phoned DEA Task Force Officer Irvin Benitez, a native Spanish speaker who previously worked with Beckman in Illinois. (Exh. 5 at 16:25; Exh. 1001 at 3; Dkt. 19 at 82, 114-15.) Beckman used his phone to call Benitez, and after giving Benitez information about the investigation and the ruse, Beckman gave his phone to Hernandez-Pineda to speak with Benitez in Spanish. (Dkt. 19 at 82,

---

[8] Again, in addition to the audio, SA Beckman—who was a party to the conversation—testified that when Waeghe approached to confirm Hernandez-Pineda's consent to search the car, he agreed to the search for a second time. (Dkt. 19 at 81-82.)

115-118.) Hernandez-Pineda continued to walk around freely, unhandcuffed, talking in a conversational tone with Benitez in Spanish, at times wandering away from agents with bodycams. As a result, as Benitez testified, only some of their conversation was captured on bodycam audio— and uncaptured portions could not be translated on the transcripts. (Dkt. 19 at 117.) However, Benitez testified that when he and Hernandez-Pineda were speaking, Hernandez-Pineda "consented" and "agreed" to the apartment search and never refused consent. (Dkt. 19 at 116-117.)

Ronsman's bodycam video (Exh. 5), Waeghe's bodycam video (Exh. 6), and the corresponding transcripts (Exhs. 1001 & 1002, respectively) include those conversations between Hernandez-Pineda, on-scene agents, and Benitez that were close enough to the bodycams to be captured on audio. They overlap where they were in proximity to the same conversation. On both bodycams, Benitez told Hernandez-Pineda that agents received information about a missing child, and Hernandez-Pineda confirmed his understanding, saying, "Uh-huh. Yes, that's what they're telling me." (Exh. 5 at 16:26-16:28; Exh. 1001 at 4; Exh. 6 at 16:26-16:28; Exh. 1002 at 2.) Benitez said that agents wanted to search his apartment for evidence on the missing-child investigation, not limited to a child's body, but "to check/look at everything to make sure everything checks out." (Exh. 5 at 16:26-16:28; Exh. 1001 at 4-5; Exh. 6 at 16:26-16:28; Exh. 1002 at 2-3.)

As indicated above in bold, when Hernandez-Pineda spoke with both Beckman, he denied living at 2080 Verlin Road. When Hernandez-Pineda spoke with Benitez in Spanish, he once again denied living there. The exchange went as follows:

> HERNANDEZ-PINEDA:    But do they have an order to check, because I don't understand . . . **I don't live here; I just came looking for/to pick up my nephew.**
>
> **SPANISH SPEAKING OFFICER:   You don't live where?**
>
> **HERNANDEZ-PINEDA:    I was coming to look for/pick up my nephew, and I stopped here because I was looking for the address.**

(Exh. 5 at 16:26-16:28; Exh. 1001 at 4; Exh. 6 at 16:26-16:28; Exh. 1002 at 2) (emphasis added).

After Hernandez-Pineda spoke with Benitez, he gave the phone back to Beckman. (Exh. 5 at 16:28; Exh. 6 at 16:28.) Beckman walked nearby on his own, talking to Benitez, at times outside the range of bodycam microphones, while Hernandez-Pineda conversed with Waeghe. (*Id.*) Beckman testified that he spoke with Benitez to "ensure that we had consent to go into the apartment, which is why [a few minutes later] I told [Hernandez-Pineda] let's go, and he said okay." (Dkt. 19 at 86.) As the bodycam shows, Beckman put Benitez on speakerphone, and the three of them conversed in both English and Spanish about the proposed search, and Hernandez-Pineda's trip from Chicago that day, ending with the following exchange just before Hernandez-Pineda led agents into the apartment:

> SA BECKMAN:    We just gotta go look in your apartment real quick and we'll be out of here. Just take us in the apartment.
>
> HERNANDEZ-PINEDA:    Let me call this girl.
>
> SA BECKMAN:    No. No, we can't do that. We're not calling her. Just take us to the apartment quick and then we'll get out of here. Let's go.
>
> HERNANDEZ-PINEDA:    Okay, okay.
>
> HERNANDEZ-PINEDA:    Okay . . . wait, wait, wait. Umm . . . you. . . ummm . . .
>
> SA BECKMAN:    Just come with me. Come on, let's go.
>
> HERNANDEZ-PINEDA:    Oh my God.

(Exh. 5 at 16:31; Exh. 1001 at 8.)

Once inside Apartment 14, Hernandez-Pineda stayed in the kitchen area with Harvath, who, with Benitez providing Spanish translation by phone, read a consent-to-search form to Hernandez-Pineda that both men signed. (Dkt. 19 at 106-09, 116; Exh. 2.) Meanwhile, Ronsman and Beckman searched the apartment, including the bathroom closet where the drugs and firearm were found. (Dkt. 19 at 87-88; Exh. 5 at 16:32.) Beckman found a quantity of cocaine, and then— with Benitez providing translation—asked Hernandez-Pineda if there was more. Hernandez-

Pineda showed agents a duffel bag containing two kilogram-sized bricks of cocaine. (Dkt. 19 at 88.) Hernandez-Pineda also showed Ronsman where a 9-mm pistol was located in the same bathroom closet. (Dkt. 19 at 53, 88; Exh. 5 at 16:41.) Later, Ronsman obtained the lease for Apartment 14, which was solely in J.P.C.'s name. (Exh. 8.)

Throughout the time that agents were inside Apartment 14 with Hernandez-Pineda, they continued speaking in a conversational tone and never handcuffed him, even when they led him out of the apartment to the police station. (Exh. 5 at 16:32-16:58.)

## II.    Argument

### A.    Hernandez-Pineda did not establish his expectation of privacy

"Fourth Amendment rights are personal. They may not be asserted vicariously, on behalf of others. An accused defendant seeking to suppress evidence obtained from an allegedly unconstitutional search bears the burden of establishing that the search violated his own Fourth Amendment rights. This is a question of substantive Fourth Amendment law, but courts often refer to it as a question of standing. A defendant has standing to challenge a search only if he has a 'legitimate expectation of privacy' in the searched area. A legitimate expectation of privacy exists when the defendant exhibits a subjective expectation of privacy and the expectation is one that society is prepared to recognize as reasonable." *United States v. Dixon*, 137 F.4th 592, 601 (7th Cir. 2025) (cleaned up).

To satisfy this burden, Hernandez-Pineda "needed to come forward with some evidence that he had a subjective expectation of privacy in [Apartment 14]." See *id.* (citing *United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006) (affirming denial of suppression motion where defendant failed to produce evidence of a privacy interest); *United States v. Meyer*, 157 F.3d 1067, 1080 (7th Cir. 1998) (same); *United States v. Ruth*, 65 F.3d 599, 605 (7th Cir. 1995) (same)).

"Whether an individual has exhibited a subjective expectation of privacy is a highly fact-specific inquiry." *United States v. Carlisle*, 614 F.3d 750, 757 (7th Cir. 2010).

For defendants like Hernandez-Pineda who don't testify or present an affidavit to establish an expectation of privacy, *Ruth* adopted—and subsequent cases like *Mendoza* and *Dixon* have echoed—the "almost impossible" standard: "As we have noted before, it is 'almost impossible' to find a privacy interest without an affidavit or testimony from the defendant." *Dixon*, 137 F.4th at 602 (quoting *Mendoza*, 438 F.3d at 795 and *Ruth*, 65 F.3d at 605). This is because "find[ing] a privacy interest . . . depends, in part, on the defendant's subjective intent and his actions that manifest that intent." *Ruth*, 65 F.3d at 605.

In *Ruth*, denial of suppression was affirmed on lack of standing "even if Ruth were allowed to rely on the evidence submitted by the government," which included that Ruth leased the garage, established electrical service for it, was seen on the premises, and had property delivered there. 65 F.3d at 605. "Further, the government's evidence at that time did not establish that Ruth had made any kind of concerted effort to keep people out, and did not establish whether a business existed in the garage, or whether Ruth had taken any other actions that demonstrated even a subjective expectation of privacy." *Id.* The analysis and result were the same in *Mendoza*, where the defendant "offered conclusory statements regarding his privacy interest in the unattached garage," "did not show that he had the right to exclude others or regulate access to the garage where his Chevy Tahoe was parked," and his housing ID and license plates were from elsewhere. 438 F.3d at 795.

*Dixon* reached the same result. The defendant requested an evidentiary hearing but "never submitted any evidence or requested an opportunity to testify to his standing." 137 F.4th at 602. His request for a hearing and the government's merits argument were based on proffers, not evidence. The circuit court disapproved this district-specific practice but nonetheless affirmed because it was Dixon's burden to establish standing, which he failed to do. As it had stressed in

*Ruth*, the court in *Dixon* highlighted that the defendant "did not claim to own or to possess legitimately any of the searched properties or to have a right to exclude others from them. He also did not testify, submit an affidavit, or produce any other evidence regarding his subjective expectation of privacy." *Id.* "Because Dixon failed to offer evidence from which the district court could find a privacy interest in the [cars and house], he failed to show that those searches intruded on his Fourth Amendment rights." *Id.*

*Dixon* cited other principles that are relevant to Hernandez-Pineda's showing of an expectation of privacy. First, where a defendant denies living at the place that was searched—as Hernandez-Pineda did here—"such statements of disassociation can indeed support a district court's finding that a defendant lacks standing to challenge a search." *Dixon*, 137 F.4th at 604 (citing *Carlisle*, 614 F.3d at 759; and *United States v. Amaral-Estrada*, 509 F.3d 820, 827 (7th Cir. 2007)). Second, Hernandez-Pineda cannot rely on his possessory interest in the drugs and firearm that were seized to make the showing. *Dixon*, 137 F.4th at 602 (citing *United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006) and *United States v. Salvucci*, 448 U.S. 83, 92 (1980)).

In *Amaral-Estrada*, the defendant was stopped and "denied any knowledge of the Chrysler M300 that [an officer] saw him driving minutes earlier." 509 F.3d at 823. He later testified and tried to qualify his prior denial, claiming "he simply [told the officer] that he did not own the car." *Id.* The district court found that he borrowed the car and knew others would be entering it, so he failed to show an expectation of privacy. *Id.* at 826-27. The Seventh Circuit affirmed, holding the defendant "possessed the car for the purposes of transporting contraband," and "his expectations while using the car were that others would enter the vehicle, taking and/or leaving items therein," and "[f]urthermore, when [agents] asked [him] about the vehicle, [he] denied any knowledge of the car." *Id.* at 827. In other words, even a presumably false statement of disassociation is relevant to the expectation-of-privacy question. "Under these facts reasonably relied upon by the district

16

court, Amaral-Estrada failed to exhibit any legitimate privacy interest in the [car] and therefore lacks standing to challenge the search[.]" *Id.*

In *Carlisle*, the defendant put down a bag when he was detained in a *Terry* stop, and when officers asked about it, he denied knowing its contents but didn't claim or deny its ownership. 614 F.3d at 754. He later testified that he didn't own it and was taking it to the garbage for someone else. *Id.* The district court found that he failed to establish an expectation of privacy, and the Seventh Circuit affirmed, saying that it faced a "nuanced question: under what circumstances does a defendant have a subjective privacy interest in a piece of property when ownership is ambiguous at the time of the search?" *Id.* at 757. It traced the caselaw, including the "clear statement" from the Supreme Court "that the individual seeking suppression of the evidence bears a burden to prove that he had a legitimate expectation of privacy in the searched property," and its own precedent where it identified the following factors "as key to determining whether an individual has a legitimate privacy interest in a given piece of property":

> (1) whether the defendant had a possessory [or ownership] interest in the thing seized or the place searched, (2) whether he had the right to exclude others from that place, (3) whether he exhibited a subjective expectation that it would remain free from governmental invasion, (4) whether he took normal precautions to maintain his privacy, and (5) whether he was legitimately on the premises.

*Id.* at 758 (citing *Salvucci*, 448 U.S. at 95, and quoting *United States v. Peters*, 791 F.2d 1270, 1281 (7th Cir. 1986) (overruled on other grounds)). It also discussed *Amaral-Estrada*, *supra*, where it "found that [he] failed to manifest any actual or subjective expectation of privacy in the car . . . based on his testimony . . . [and where] we also relied on the fact that [he] told officers he did not know anything about the car." *Id.* at 759. In the end, the *Carlisle* court affirmed based on the lack of standing because he disclaimed ownership and his ability to exclude others was murky at best, and "[w]hat push[ed] the case fully over the line is the complete lack of testimony that [he]

had any subjective expectation that the bag would remain free from governmental invasion." *Id.* at 659.

With these principles in mind, Hernandez-Pineda faces the "almost impossible" standard adopted in *Ruth*—tenuously relying on the government's evidence to establish his subjective expectation of privacy. To that end, the record shows that he possessed keys to Apartment 14 on 3/7/2024, was there that day and parked in the garage and an outside stall, took agents inside by unlocking the common door and apartment door, and provided the address to officers during a traffic stop in January 2024. But individually and collectively, this is not sufficient evidence of his subjective privacy interest in the apartment. Similar evidence was insufficient in the cases cited above, and there is no reason to treat Hernandez-Pineda's showing as more convincing. To repeat, J.P.C. held the lease for Apartment 14, not Hernandez-Pineda.[9] J.P.C.'s lease permitted him to use the apartment for "residential purposes" only, and it forbid "any guest or invitee to reside [there] for any period exceeding 3 days without prior written consent of the Landlord." (Exh. 8 at lines 76, 96-97.) In January 2024, Hernandez-Pineda said during a traffic stop that he lived there— although we don't know the specifics or context since he didn't testify. Then in March 2024—well beyond the lease's three-day guest period—he said the opposite by repeatedly denying that he lived there. The bottom line is that whether officers believed or disbelieved Hernandez-Pineda about his flip-flopping connection to Apartment 14,[10] their beliefs are insufficient and irrelevant

---

[9] A privacy interest under the Fourth Amendment doesn't require a "recognized property interest at common law." *Carlisle*, 614 F.3d at 756 (citing *Rakas*, 439 U.S. at 143). However, it remains a relevant factor to show legitimate authority to be there, particularly where a defendant fails to testify or present an affidavit establishing his subjective connection to an apartment where he's not on the lease.

[10] At the hearing, the government asked Beckman if he believed that Hernandez-Pineda understood their conversation in English. Defense counsel objected, disputing "that this witness can testify what this defendant understood or believed." The Court sustained the objection. (Dkt. 19 at 79.) Likewise, an agent's opinion cannot establish Hernandez-Pineda's subjective expectation of privacy.

to what Hernandez-Pineda must personally demonstrate: his "subjective intent and his actions that manifest that intent." See *Ruth*, 65 F.3d at 605.

On this evidence, Hernandez-Pineda "did not establish that [he] made any kind of concerted effort to keep people out . . . or whether [he] had taken any other actions that demonstrated even a subjective expectation of privacy." See *Ruth*, 65 F.3d at 605. The best he can muster is that the doors were locked, which is typical for common-entry doors and apartment doors, and those efforts must be attributed to J.P.C. without hearing directly from Hernandez-Pineda about it. Moreover, the Court is left to speculate about the other *Carlisle* factors—and guesswork is impermissible when conducting a "highly fact-specific inquiry": Did Hernandez-Pineda have J.P.C.'s consent to be there? If so, could he be there for 10 minutes, an hour, overnight, more than three days (prohibited by the lease)? Did J.P.C. give keys to anyone else? If so, did Hernandez-Pineda have authority to control their access and did he take steps to do so? Did Hernandez-Pineda pay rent to J.P.C. or contribute to apartment costs in any way? Hernandez-Pineda has not supplied, and the record doesn't show, reliable evidence to answer these questions.

Based on the record, Hernandez-Pineda's connection to Apartment 14 is ambiguous, which isn't enough to meet his burden. The Court can find that he has a connection to J.P.C., the only person on the lease and a known cocaine source. But the Court cannot determine whether Hernandez-Pineda qualifies as an overnight guest, who may be able to claim Fourth Amendment protection, rather than someone who is merely present with the leaseholder's consent, who may not be able to do so. *See Minnesota v. Carter*, 525 U.S. 83, 90 (1998).

In sum, Hernandez-Pineda's motion should be denied because he failed to demonstrate an expectation of privacy.

**B.**  **Alternatively, Hernandez-Pineda consented to the search**

"Consent is a well-recognized exception to the Fourth Amendment's warrant requirement." *United States v. Jones*, 22 F.4th 667, 675 (7th Cir. 2022) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). The government must show by a preponderance of the evidence that consent was freely and voluntarily given under the "totality of circumstances," including: "(1) the age, education, and intelligence of the defendant; (2) whether he was advised of his constitutional rights; (3) how long he was detained before consenting; (4) whether he consented immediately or was prompted by repeated requests; (5) whether physical coercion was used; and (6) whether he was in custody when he consented." *Id.* at 675-76 (quoting *Bustamonte*, 412 U.S. at 227). *Miranda* warnings are not required for a consent to search to be deemed voluntary. *United States v. Renken*, 474 F.3d 984, 987-88 (7th Cir. 2007.) *Bustamonte* "squarely foreclosed" that "officers should have informed [a defendant] of his right to refuse consent, explained the difference between an arrest warrant and a search warrant, and retrieved consent forms from their vehicle" because "officers are not required to inform individuals of their right to refuse consent and that consent need not be in writing." *Jones*, 22 F.4th at 676. "No single factor controls," and "[i]t does not matter that officers sometimes use consent forms or go into greater detail about an individual's rights." *Id.*

While Hernandez-Pineda's motion doesn't claim that he was illegally seized, the encounter was lawful as consensual or as a *Terry* stop. "[O]fficers may approach a willing person in a public place and ask that person questions without violating the Fourth Amendment." *Jones*, 22 F.4th at 673 (cleaned up). "If the encounter occurs in a public place, courts ask whether a reasonable person would have felt free to leave . . . [b]ut if police approach an individual in a confined space, such as a bus, the proper inquiry is whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter." *Id.* "Either way, courts should consider the totality

of the circumstances, including where the interaction took place, how many officers were present, the extent to which the police presence was threatening, whether the officers made any show of weapons or physical force, the officers' language and tone, whether the officers suggested that the defendant was suspected of a crime, and whether the officers told the defendant he was free to leave." *Id.*

Under *Terry*, "officers may conduct a brief investigatory stop of a suspect if they have reasonable suspicion based on articulable facts that a crime is about to be or has been committed." *Carlisle*, 614 F.3d at 754-55 (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "The suspicious conduct may be ambiguous and susceptible to an innocent explanation, but the officers may detain the individual to resolve such ambiguity." *Id.* (citing *Illinois v. Wardlow*, 528 U.S. 119, 125-26 (2000). "Officers may rely on their experience in evaluating the significance of the suspect's conduct." *Id.*

By these standards, agents conducted a lawful encounter with Hernandez-Pineda. He was approached in a public place, in a low-key manner, by a limited number of agents. They didn't handcuff or restrain him, and they didn't tell him he was detained or under arrest, and it's telling that he walked around freely, at times without agents anywhere close to him. At all times, they spoke in a conversational, non-confrontational tone. Agents only held his identification and phone for a brief period before returning them, and they never seized his keys, so he could have entered the building and terminated the encounter at any time. Waeghe's police vehicle was initially positioned behind the Audi, but it was later moved, and Hernandez-Pineda could've asked for it to be moved sooner if he wanted to drive away rather than go inside. The content of their conversation reinforced its consensual nature, with agents making no threats, asking for cooperation and consent, finding a Spanish-speaking officer to alleviate any concern over a language barrier, and apologizing for taking up his time.

Even if the encounter is not deemed consensual, it was justified as a *Terry* stop. Agents possessed and articulated reasons to suspect that Hernandez-Pineda had just engaged in a hand-to-hand drug deal on 3/7/2024, namely: their training and experience; receiving the tip from DEA-Chicago that the Audi's occupants engaged in bulk-cash smuggling and were driving to Green Bay; confirming the Audi was heading northbound on the highway; following it to Green Bay and identifying J.P.C. as one of the occupants; having reliable evidence that J.P.C. was a cocaine source based on a prior hand-to-hand exchange with D.M.; watching Hernandez-Pineda drop off J.P.C., drive 2080 Verlin Road, and then drive to the JBS parking lot, where he did a hand-to-hand exchange with a male who approached the Audi's driver's window; conducting a consent-search of the Audi (which is not challenged), finding a knotted-corner baggie on the floorboard.

Turning to Hernandez-Pineda's consent to search Apartment 14, the record proves that it was freely and voluntarily given. As previously indicated, the encounter was conducted in a non-confrontational and low-key manner, with agents asking for cooperation and consent. Hernandez-Pineda is middle-aged, with no apparent mental or physical ailments. When they conversed with him in English about the missing child and searching the Audi, he had no difficulty understanding, denying it was his car or that he had been in the area. He told agents he was from Mexico but had lived in Wisconsin for "20 years." (Exh. 6; Exh. 1002 at 4.) Indeed, he later confirmed—when speaking to Benitez in his native Spanish—that he understood what English-speaking agents had told him about the missing child, saying, "Yes, that's what they're telling me." (Exh. 5 at 16:26-16:28; Exh. 1001 at 4; Exh. 6 at 16:26-16:28; Exh. 1002 at 2.) When Beckman raised the prospect of searching the apartment, Hernandez-Pineda showed understanding and acumen, distancing himself from it by denying any connection to it, claiming that he was looking for his nephew and didn't know the address. Beckman honored his request for a translator and contacted Benitez, who explained the situation to him and answered his questions in Spanish. Once again—but this time

in his native Spanish—Hernandez-Pineda denied living there. Benitez testified that during their conversations in Spanish, Hernandez-Pineda consented to a search of the apartment and never refused it. True, the consent form was signed during the search, but it reinforces the knowing and voluntary nature of his prior oral consent, and that he never refused or limited the scope.

Hernandez-Pineda's motion cites out-of-circuit cases to urge that the missing-child ruse negated his consent. His primary cite is a *Bivens* action where the First Circuit surveyed the cases and observed that it was "beyond debate that deception is a well-established and acceptable tool of law enforcement," and "despite the broadly framed objections of courts [citing none in the Seventh Circuit] to deception by known government agents, the general consensus in the case law is that such deception, including lying about the purpose of an investigation, is not categorically off-limits in obtaining consent to search." *Pagan-Gonzalez v. Moreno*, 919 F.3d 582, 593-94 (1st Cir. 2019). The circuit court discussed two exceptions to the consensus: first, when officers falsely claim authority that they lack, for instance, by saying they have a warrant; and second, when officers implicitly coerce consent by falsely present[ing] a need for urgent action," like falsely implying a bomb was planted there, lying about a gas leak, or fabricating a "grave emergency" about a missing girl. *Id.* (cleaned up).

Assuming for the sake of argument that this circuit would adopt and follow *Pagan-Gonzalez*'s summary of the consensus, the ruse that agents used here did not coerce Hernandez-Pineda's consent. Both the bodycams and Beckman's testimony establish that agents did not present the missing-child situation as an emergency. Rather, they said the child was missing for weeks, was likely deceased, they've been following up on numerous leads like this, they realized they were likely wasting their time, and they apologized for having to approach him and ask about it. Nothing about Hernandez-Pineda's demeanor or body language showed that he considered the

situation to be urgent. Put simply, while agents presented the situation as a serious matter, they did not present it as a grave emergency.

Hernandez-Pineda's motion also claims that scope of the search exceeded any consent. He is wrong. In *Jones*, the Seventh Circuit summarized the settled principles on this issue, making clear that "[t]he burden is on the individual to limit the scope of consent" before or during the search, and if the "attempt to withdraw consent is equivocal, police officers may reasonably continue their search in the premises entered pursuant to the initial grant of authority"; "officers may look in any area that could reasonably contain the sought-after item or person"; and "[w]hether a search exceeded the scope of consent is a factual finding" to be "assessed under an objective reasonableness standard that asks what a typical reasonable person would have understood to be within the scope." 22 F.4th at 678-79 (cleaned up).

Applied here, the evidence shows that agents sought consent to search for evidence relating to the missing-child investigation, not just to look for a child's body. True enough, Beckman asked if the child's body was inside, but a single question cannot be reasonably construed as a limitation, particularly where it was Hernandez-Pineda's obligation to place limits before or during the search, which he did not do. Before he consented to the apartment search, he consented to the Audi search, where he confirmed his consent to Waeghe and that agents would find "nothing related to that." (Exh. 7 at 16:10-16:14; Exh. 1003 at 2-4). See *United States v. Breit*, 429 F.3d 725, 730 (7th Cir. 2005) (upholding the search based in part on the officer's testimony that "he told Breit they were searching for anything ***related to*** criminal activity, not just evidence related to guns") (emphasis added). Critically, Hernandez-Pineda then watched as three agents conducted a comprehensive search for several minutes of the Audi's passenger compartment and trunk that was obviously more extensive than needed if they were just looking for a child's body.

At the suppression hearing, the Court invited the parties to review *United States v. Dichiarinte*, 445 F.2d 126 (7th Cir. 1971). There, agents told the defendant they wanted his consent to search for drugs. He gave it, but when he saw agents looking through his papers, he asked them, "Does that look like narcotics if that is what you want to search for?", and he announced, "The search is over. I am calling off the search." *Id.* at 128. On those facts, the circuit court held the search "was unreasonable because it went beyond the scope of defendant's consent," effectively getting "limited consent" and then conducting "a general search." *Id.* at 130. Those are not the facts presented here. First, there was no limitation placed on the consent, which reasonably included anything related to the missing-child investigation. Second, the court in *Dichiarinte* expressly distinguished its holding from those situations—like the one at issue here—where officers lawfully seize contraband and evidence of a crime when searching places "within the scope of consent," saying: "Of course, if the government agents acting within the parameters of defendant's consent had come upon contraband, fruits or instrumentalities of crime, or clear evidence of criminal behavior which was lying in plain view, they could have seized those items." *Id.* at 130. That is what happened here. When agents searched Apartment 14 and found cocaine in the bathroom closet, they knew it was contraband and were looking in an area within the scope of consent. They then asked Hernandez-Pineda if there was additional cocaine, and without revoking consent or limiting the scope, he did so, showing them a duffel bag in the same closet. Next, when firearms were discussed and Ronsman asked where it was, Hernandez-Pineda again pointed it out in the same closet. These items were in plain view, in an area within the scope of consent, and readily apparent as illegal drugs and evidence of possessing a firearm in furtherance of drug trafficking.

**<u>Conclusion</u>**

For the foregoing reasons, Hernandez-Pineda's motion to suppress should be denied.


Respectfully submitted on July 17, 2025,

<u>/s Timothy W. Funnell</u>
TIMOTHY W. FUNNELL
Assistant U.S. Attorney
WI Bar No. 1022716
United States Attorney's Office
Eastern District of Wisconsin
Green Bay Division
205 Doty Street, Suite 301
Green Bay, WI 54301
Tim.Funnell@usdoj.gov