UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

---

UNITED STATES OF AMERICA,

      Plaintiff,

      v.                              Case No. 25-CR-64

JOSE ANGEL HERNANDEZ-PINEDA,

      Defendant.

---

## DEFENDANT'S RESPONSE TO
## GOVERNMENT'S BRIEF ON MOTION TO SUPPRESS

---

The defendant, by attorney Tom Phillip, hereby responds to the government's brief (Docket No. 22) regarding the motion to suppress. Hernandez-Pineda moved to suppress the entry into his residence, any evidence found or observed on the entry to his residence, and any evidence arising as fruits of the entry. Docket No. 13. Hernandez-Pineda argued that any consent to search was not valid because it was based on law enforcement's objectively false reasons for the search, and also that any search exceeded the scope of any consent. *Id*. Hernandez-Pineda requested an evidentiary hearing, which the Court held on June 10, 2025. Docket No. 17. The Court ordered a transcript of the evidentiary hearing (Docket No. 19) and set a briefing schedule. The government filed its brief on July 17, 2025. Docket No. 22. Hernandez-Pineda now responds.

1

## I.    FACTS

The search giving rise to the case took place on March 7, 2024. Hernandez-Pineda was originally charged in Brown County Circuit Court with the same offenses. His retained counsel in state court did nothing other than postpone the case. Eventually, after a year passed with no activity in the state court case, the government charged Hernandez-Pineda by complaint on March 18, 2025, and by indictment on April 1, 2025. Docket Nos. 1, 7.

Hernandez-Pineda agrees with the government that the videos from the scene are the actual evidence. Docket No. 22 at 3, fn. 3. The transcripts of the videos entered as Defense Exhibits 1001 – 1003 are useful for reference and to make quotations easier to find. Hernandez-Pineda notes that the Spanish portions of the transcripts were prepared by a federally-certified Spanish interpreter, and that Officer Benitez testified that the Spanish portions were accurate. Evid. Hrg. Transcr. at 116. Given that the record already contains the video evidence, transcripts, and testimony, Hernandez-Pineda supplies a short factual summary below and refers to relevant facts in the argument sections that follow.

On March 7, 2024, law enforcement was investigating Hernandez-Pineda regarding the sale of controlled substances. They followed him to his apartment and to different locations in Green Bay, ending up again at Hernandez-Pineda's apartment complex on Verlin Road. Law enforcement officers parked

2

him in and then spoke to Hernandez-Pineda in the parking lot, using both English and Spanish. A report provided in discovery states "[t]o conceal the nature of the investigation, [law enforcement] did not disclose that the reason for the consensual encounter was due to drug related activity observed that day." Indeed, body camera footage proves that to be so. Specifically, law enforcement at the scene lied to Hernandez-Pineda, telling him that they needed to quickly search his car and apartment for E.V., an actual missing three-year-old child. Hernandez-Pineda exhibited confusion, both regarding language problems and why he would be a suspect regarding a missing child, saying several times that he did not understand. Law enforcement eventually had a Spanish-speaking officer talk to Hernandez-Pineda by cell phone. Some portions of the Spanish conversation can be heard on the body camera footage, but some cannot, either because of ambient noise or because the body camera wearer was too far away from the conversation.

At no time during the conversation did law enforcement mention the true reason for their interest in Hernandez-Pineda, which was a drug investigation. Rather, the entire conversation revolved around the false reason of quickly needing to search for the missing three-year-old. Law enforcement officers did not give Hernandez-Pineda much, if any choice, telling him they "needed" to search his apartment and directing him to "just take" them to his apartment.

Hernandez-Pineda eventually acquiesced. Using his keys, Hernandez-Pineda opened the outer and inner doors to his apartment, and he and law enforcement officers entered. Body camera footage shows law enforcement immediately searching through the apartment in places where a missing three-year-old could not be found, such as dresser drawers and shoe boxes. Approximately 10 minutes later, after law enforcement searched his apartment and found cocaine in a box, Hernandez-Pineda signed a consent to search form. The review and signing of that form is not captured on any body camera footage. In all, law enforcement found approximately 2.5 kilograms of cocaine, a firearm, ammunition and magazines during the search.

## II.     STANDING / EXPECTATION OF PRIVACY

In arguing that Hernandez-Pineda has not shown an expectation of privacy, the government's brief elevates form over substance, cites cases that are mostly inapposite, and distracts from the thrust of the motion to suppress. With that as an overlay, here's how Hernandez-Pineda showed an expectation of privacy.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "It is axiomatic that the physical entry of the

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

home is the chief evil against which the wording of the Fourth Amendment is directed." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quotation omitted). That is why warrantless searches of the home are presumptively unreasonable. *Kentucky v. King*, 563 U.S. 452, 459 (2011) ("It is a basic principle of Fourth Amendment law, we have often said, that searches and seizures inside a home without a warrant are presumptively unreasonable." (quotation omitted)). This is also why the Supreme Court has long emphasized that law enforcement should get a warrant rather than resort to warrantless entries. *See, e.g., Ornelas v. United States*, 517 U.S. 690, 699, (1996) ("[T]he Fourth Amendment demonstrates 'a strong preference for searches conducted pursuant to a warrant.'"); *Riley v. California*, 573 U.S. 373, 403 (2014)("Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple — get a warrant.").

"Fourth Amendment standing is not 'jurisdictional,' but instead reflects the 'idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search.'" *United States v. Ostrum*, 99 F.4th 999, 1004 (7th Cir. 2024) (quoting *Byrd v. United States*, 584 U.S. 395, 410 (2018)). Therefore, when determining standing under the Fourth Amendment, we ask whether a defendant has a "legitimate expectation of privacy" in the place searched. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). "A

legitimate expectation of privacy exists when the defendant exhibits a subjective expectation of privacy [in the location searched] and the expectation is one that society is prepared to recognize as reasonable." *United States v. Pitts*, 322 F.3d 449, 456 (7th Cir. 2003).

The government relies primarily on *United States v. Dixon*, 137 F.4th 592 (7th Cir. 2025), to argue that Hernandez-Pineda does not have standing. That's a curious case on which to rely, because "both parties [in *Dixon*] failed to submit actual evidence supporting the factual assertions in their briefs," and there was no evidentiary hearing. *Dixon* at 599. Here, the record developed at the evidentiary hearing, both testimony and exhibits, is replete with facts upon which the Court can find standing. To begin, the government's own Exhibit 1 shows that Hernandez-Pineda gave the Verlin Road address as his residence in a traffic stop a few months before the search. Govt. Exh. 1 at 36. What's more, testimony at the hearing showed that law enforcement relied upon that information as being Hernandez-Pineda's correct address. If Hernandez-Pineda wasn't living there, why would he have given that address, and why would law enforcement have relied upon it?

To bookend the facts, law enforcement also filled in the consent form with Hernandez-Pineda's address on Verlin Road. *See* Govt. Exh. 2.[1] As testified to by Officer Harvath, law enforcement filled in that address which confirmed Hernandez-Pineda lived there. Evid. Hrg. Transcr. at 109. Fairly obviously, law enforcement would want the form to be accurate so they are actually getting consent to search the right place. Hernandez-Pineda also signed the form, stating objectively and subjectively that it was his apartment that was being searched. So far, then, two government exhibits and a government witness all confirm the defendant's standing to contest the search.

Other testimony at the evidentiary hearing supports Hernandez-Pineda's legitimate expectation of privacy in his apartment. The government's witnesses at the hearing referred to the Verlin Road address as being Hernandez-Pineda's, *i.e.*, "his apartment." *See* Evid. Hrg. Transcr. at 77 (Beckman: "we needed to check his vehicle and his apartment." Evid. Hrg. Transcr. at 90-91 (Beckman: "At that point when we approached him that was the goal to try and gain consent for the vehicle and the apartment that he was living in.")

---

[1] Hernandez-Pineda takes pains to point out that the signed consent form came too late to save the illegal search. As argued *passim*, law enforcement obtained entry and consent by fraudulent means, vitiating any consent. As also pointed out, law enforcement began searching the apartment for drugs immediately upon entry, well before any consent form was signed.

The body-camera footage from the scene also shows officers talking to Hernandez-Pineda about the search, saying that they want to go into "your apartment" to follow up on the (nonexistent) tip regarding E.V. *See* Govt. Exhibit 5 at time-stamp 16:31:07[2] (running time 13:30) and Defense Exhibit 1001 at 8 (Beckman: "we just gotta go look in your apartment real quick."); *see also* Govt. Exhibit 7 at time-stamp 16:12:48 (running time 1:52) and Defense Exhibit 1003 at 3 (Beckman: "we just need to check this quick and check your apartment real quick.").

Body camera footage also captures a subtle but telling fact showing Hernandez-Pineda's expectation of privacy: law enforcement let him change jackets during the interaction in his apartment. Specifically, body camera footage shows that Hernandez-Pineda is wearing a black / gray sweatshirt or jacket at the beginning of his interaction with law enforcement. In the middle of the video, while in his apartment, Hernandez-Pineda is shown in a t-shirt, sitting on a chair with the black jacket draped over the back and seat of the chair. Hernandez-Pineda is then shown picking up a brown jacket and putting it on as he gets up from the

---

2 When played, the video exhibits in the record show both a running time (found on the bottom of the display) and a time-stamp on the upper right-hand corner of the display. This brief will refer to both times, hopefully for ease of reference, as "time-stamp XX:XX:XX, running time XX:XX." Also, the time-stamp in the upper right-hand corner is shown in a 24 hour/military fashion. Most if not all of the time-stamps are in the 16:00 hour range, which corresponds to 4:00 p.m.

couch. And finally, near the end of the video, Hernandez-Pineda is wearing a

brown jacket. The specific locations in the video are as follows:

Government Exhibit 7 (Waeghe body cam video Axon Body 3 video)

> Time-stamp 16:11:16 (00:20 running time)
> Hernandez-Pineda gets out of his car wearing a black
> or gray sweatshirt/jacket

Government Exhibit 5 (Ronsman Body Cam video)

> Time-Stamp 16:45:11 (running time 27:34)
> Hernandez-Pineda sitting on a chair with the black/gray
> jacket on the back of the chair

> Time-Stamp 16:54:36 (running time 36:59)
> Hernandez-Pineda picks up a brown jacket from the couch
> and puts it on

> Time-Stamp 16:57:32 (running time 39:55)
> Hernandez-Pineda now wearing a brown jacket

For ease of reference, counsel for Hernandez-Pineda attaches screenshots from

Government Exhibits 5 and 7 of the time-stamps noted above. *See* Attachment 1.

This simple act of changing clothes speaks volumes. It's Hernandez-

Pineda's apartment because his clothes are there, and he changes jackets in his

apartment during the interaction with law enforcement. He knows what's in the

apartment because he lives there. Law enforcement knows the same because they

let him change his jacket; they'd hardly let him steal somebody else's clothes.

Hernandez-Pineda changing his jacket is an obvious demonstration of his privacy interest in the apartment, both subjectively and objectively.

Another strong objective and subjective manifestation of Hernandez-Pineda's privacy interest in the apartment is the fact that he had the keys. He drove to his apartment with his keys to his apartment. The doors (both outer and inner) to the apartment were locked, showing that Hernandez-Pineda wanted to keep others out of his apartment. And, once law enforcement coerced their entry, they had Hernandez-Pineda open the outer and inner locked doors. Why? Because he knew what keys to use, because it was his apartment. The video from the scene shows law enforcement throwing the keys from officer to officer, ending up with Hernandez-Pineda. He doesn't fumble around, but opens the outer door quickly; the officers troop up the stairs after him and watch him open the inner door to his apartment, again without fumbling around. Why? Because the keys are *his* keys, and the apartment is *his* apartment. Again, both subjectively and objectively, the evidence shows Hernandez-Pineda has a legitimate expectation of privacy in the location that was searched.

Officer Ronsman testified that law enforcement looks for identifying documents during a search to help determine who lives at a residence. In this case, Officer Ronsman testified that law enforcement found Hernandez-Pineda's

passport[3] and his Mexican ID in the bedroom of the apartment. Evid. Hrg. Transcr. at 62. The officer's recollection was refreshed by a contemporaneous inventory page from discovery listing those items that were found in the apartment during the search. Having his identifying documents in the apartment, particularly his passport, shows Hernandez-Pineda's subjective (and objective) expectation of privacy and safety in the apartment. A passport is an important document that any person wants to keep safe and secure. Unless actually traveling at the time, it's not something that a person generally keeps on their person. Rather, you keep your passport safe and secure at home. Hernandez-Pineda having important identifying documents in his locked apartment is a simple and obvious showing of his expectation of privacy.

The government tries to make something of Hernandez-Pineda's weak denial that he didn't live there. But even the government's witnesses didn't believe that. Officer Beckman flatly testified "no, I did not" when asked if he believed the defendant's denial. Evid. Hrg. Transcr. at 98. Furthermore, law enforcement would not have gone to such great lengths to gain consent to enter the apartment were they not sure it was Hernandez-Pineda's.

---

[3] A picture of the defendant's passport was also provided in discovery.

Hernandez-Pineda's reluctance to let law enforcement enter also shows his expectation of privacy. Were it really not his place, he wouldn't have cared about their entry. But he is obviously hesitant on the video footage. Hernandez-Pineda asks Spanish-speaking officer Benitez "but do they have an order to check" which, fairly construed, is Hernandez-Pineda asking whether there's any sort of warrant or court order. *See* Defense Exhibit 1001 (Transcript of Gov't Exh. 5, Ronsman Body Cam Video) at 4. After saying "okay okay," Hernandez-Pineda then also says "wait, wait," further showing reluctance for law enforcement to enter.

The government cites cases regarding standing that are inapposite or distinguishable. None of them involve apartments, houses, or residences, which are the chief locations that the Fourth Amendment is designed to protect. *Welsh v. Wisconsin, supra*. Rather, the government's cases involve garages, cars, and backpacks. *See United States v. Ruth*, 65 F.3d 599, 605 (7th Cir. 1995)(garage), *United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006)(garage), *United States v. Amaral-Estrada*, 509 F.3d 820, 827 (7th Cir. 2007)(car), *United States v. Carlisle*, 614 F.3d 750, 757 (7th Cir. 2010)(backpack). Garages and cars and backpacks are not an apartment, and the government's reliance on cases about them is not persuasive.

The government cites *United States v. Amaral-Estrada,* 509 F.3d 820 (7th Cir. 2007), for support that Hernandez-Pineda lacks standing. But as with other government citations, *Amaral-Estrada* is inapposite. That case did not involve an apartment, but a borrowed car. The facts of that case specifically say that the defendant's "expectations while using the car were that others would enter the vehicle, taking and/or leaving items therein." *Id.* at 827. Based on those facts, the court found no expectation of privacy. But again, we have an apartment, not a car, and the government's generalization from one to the other goes too far. Also, factually, Hernandez-Pineda had the keys to his apartment and kept it locked. The record is devoid of evidence that he allowed others to come and go at will, so *Amaral-Estrada* is of very limited utility.

Similarly inapposite is the government's reliance upon *United States v. Carlisle*, 614 F.3d 750 (7th Cir. 2010). *Carlisle* dealt with a backpack (obviously different than an apartment) that the defendant said was not his and that he was taking to the garage for somebody else. The court in *Carlisle* said there was a nuanced question of standing when the ownership of the backpack was ambiguous at the time of the search. The government tries to liken this to Hernandez-Pineda's weak denial of living in the apartment. As noted above, nobody believed that. *See* Evid. Hrg. Transcr. at 98; "No, I did not." Also, it was

not ambiguous to anybody (to law enforcement or to Hernandez-Pineda, for that matter) who lived in the apartment. Hernandez-Pineda gave the Verlin Road address a few months prior in a traffic stop, a fact recorded in law enforcement records. *See* Gov't. Exhibit 1. Not only was that fact recorded, law enforcement relied upon it on the day of the events. Other arguments throughout this brief show that residence in the apartment was not ambiguous, then or now, and the government's attempt to analogize a case about a backpack to the situation here is a brook too broad for leaping.

While the government's use of the facts of *Carlisle* is inapposite, that case does suggest five factors to consider regarding standing. *Carlisle* at 758. All of them favor Hernandez-Pineda. First, Hernandez-Pineda had a possessory interest in the apartment because all of his belongings and clothing were there. Second, he exercised his right to exclude others — he had the keys and locked the doors. Third, he had a subjective expectation to remain free of government invasion; not only did he lock the doors, the video evidence at the hearing clearly showed his hesitancy at allowing law enforcement to enter. Along the same line, Hernandez-Pineda's apartment is not a public venue. Law enforcement clearly needed and wanted his permission to enter, going through their deplorable ruse to gain entry. Why go through that if his consent was not needed? Fourth (probably a duplicate

of the second point), Hernandez-Pineda took normal precautions – he locked the doors and took the keys with him. Fifth and finally, Hernandez-Pineda was legitimately present. Though the government presented a lease agreement in somebody else's name, the government did not present any information that Hernandez-Pineda was prohibited or barred from residing at the Verlin Road address. *See, e.g., United States v. Walker*, 2025 U.S. App. LEXIS 17763 at 8 (7th Cir. July 17, 2025)(finding an overnight guest had a legitimate expectation of privacy; "The government identifies no order prohibiting Walker from being at the Shipp residence. Walker was not evicted from Shipp's residence nor subject to a protective order barring him from the residence…Accordingly, we agree with the district court that Walker's status as an overnight guest, who spent most nights at the Shipp residence, gave him a legitimate expectation of privacy in that residence.").

It is well-established that a person has a legitimate expectation of privacy in a home in which they are an overnight guest. *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990). Hernandez-Pineda was more than just an overnight guest; *he lived in* the apartment. He had the keys and locked the doors. He had the keys and opened the doors when law enforcement lied to gain entry. His property and clothing were in his apartment, and law enforcement let Hernandez-Pineda

change sweatshirts during the time inside his apartment. "A legitimate expectation of privacy exists when the defendant exhibits a subjective expectation of privacy [in the location searched] and the expectation is one that society is prepared to recognize as reasonable." *United States v. Pitts*, 322 F.3d 449, 456 (7th Cir. 2003). How much more of a legitimate expectation of privacy can there be? You have the keys, you lock the doors, your property and passport is inside, and you change your clothes while inside, and, weeks before, you tell law enforcement at a traffic stop that's where you live. Those facts, both subjectively and objectively, show Hernandez-Pineda had a reasonable expectation of privacy in his apartment. To argue otherwise defies both the facts and common sense.

## III.    INVALIDITY OF CONSENT

Consent searches are valid only if the consent was freely and voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). The question of whether consent was voluntary, as opposed to the product of duress or coercion, express or implied, is a question of fact to be determined by the totality of the circumstances. *Id*. at 227. The government bears the burden of proving voluntariness by a preponderance of the evidence. *Id*. at 222. "But the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the

coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Id*. at 228.

Courts, including the Seventh Circuit, have found that consent obtained through trickery or deception by law enforcement may be involuntary. *See United States v. Griffin*, 530 F.2d 739, 743 (7th Cir. 1976) ("Trickery, fraud, or misrepresentation on the part of the police to gain entry naturally undermines the voluntariness of any consent."); *see also Hadley v. Williams*, 368 F.3d 747, 749 (7th Cir. 2004) (finding consent to enter home was involuntary where police obtained consent through "an outright and material lie"). The First Circuit has further elaborated on what kinds of trickery or deception is most likely to render consent involuntary:

> [W]hile the fact-specific nature of the voluntariness inquiry makes it difficult to draw many bright lines within this murky area of law concerning consents [to search] obtained by deception as to purpose, courts have uniformly recognized that the Fourth Amendment may be violated when consent is obtained through a law enforcement officer's false claim of authority or lies conveying an exigent need for the search.

*Pagan-Gonzalez v. Moreno*, 919 F.3d 582, 596 (1st Cir. 2019) (internal citation omitted).

Both kinds of deception — manufactured exigency and claims of authority — were present here. First, law enforcement officers used a "ruse," telling Hernandez-Pineda that they needed to search his car and home for a missing child, creating a false sense of exigency. And, second, officers implied they had a legal right to search Hernandez-Pineda's home by repeatedly telling him that they "needed" to conduct the search and eventually explicitly *directing* him to take them to his apartment, rendering Hernandez-Pineda's purported "consent" nothing more than acquiescence to a claim of authority. Each of these issues render Hernandez-Pineda's consent involuntary, and the problem is even more pronounced when considering the totality of the circumstances.

## A. Law enforcement's missing child "ruse" rendered Hernandez-Pineda's purported consent involuntary.

"Courts have regularly held that coercion is implicit when officers falsely present a need for urgent action." *Pagan-Gonzalez v. Moreno*, 919 F.3d 582, 594-596 (1st Cir. 2019)(discussing cases regarding consent and deception); *see also United States v. Montes-Reyes*, 547 F. Supp. 2d 281 (S.D.N.Y. 2008)(finding lack of consent where officers falsely stated they sought entry to hotel room to search for a missing girl, but planned to search for drugs, because police fabricated a "grave emergency"); *Krause v. Commonwealth*, 206 S.W.3d 922, 926 (Ky. 2006) (surveying cases, and finding coercion where officer obtained consent to search a residence

based on a false report that a young girl claimed she had been raped at that location)). Here, law enforcement officers falsely told Hernandez-Pineda they were looking for a real missing child, presenting a need for urgent action to coerce his consent.

A district court case with facts very similar to Hernandez-Pineda's found suppression to be warranted. In *United States v. Montes-Reyes*, 547 F. Supp. 2d 281 (S.D.N.Y. 2008), a DEA agent posing as a New York City Police Department officer knocked on the defendant's hotel room door, told him they were looking for a missing four-year-old girl and showed him a flyer stating that the girl was endangered. The officer asked the defendant if he could enter to search for the missing girl, and the defendant consented. The DEA agent, however, "was not looking for the missing girl; rather, he wished to search for evidence of drug dealing, and had determined to use this ruse to obtain Montes-Reyes's consent to search the room." *Id.* at 283. The court noted that the scenario presented to Montes-Reyes conveyed a sense of urgency and danger.

After discussing the basics of Fourth Amendment law and consent, the court framed the issue as whether consent given under these "missing child" circumstances could be considered voluntary. *Id.* at 286. The court noted that "the examination is particularly important when the officer's identity is disclosed. Law

enforcement officers are representatives of the government and figures of authority in the community. 'It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement.'" *Id*. at 286 (citing *Schneckloth*, 412 U.S. at 232).

Ultimately, the court held that the consent given by the defendant could not be considered voluntary, as the "missing girl" ruse used by law enforcement created a false sense of exigent circumstances. *Id*. at 291. As the court explained, "Montes-Reyes would have had every reason to believe that his failure to consent to the search would hinder or delay the efforts to resolve safely (what appeared to be) a grave emergency about which the authorities were sufficiently concerned that they dispatched a squad of agents to investigate. In such a scenario, the decision to allow the police into the premises cannot be the product of an essentially free and unconstrained choice." *Id*.

While recognizing the difficulty of investigating drug cases, the court in *Montes-Reyes* noted that "illegitimate and unconstitutional practices get their first footing in that way, namely: by silent approaches and slight deviations from legal modes of procedure…It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Id. at* 291-292 (citing *Schneckloth*, 412 U.S. at 228-29)(quoting *Boyd v.*

*United States*, 116 U.S. 616, 635 (1886)). So from 1886 (*Boyd*), to 1973 (*Schneckloth*), to 2008 (*Montes-Reyes*), courts have been reminding us that that the Fourth Amendment should not be easily dispensed with. It appears to be time for another reminder, particularly here, where law enforcement specifically planned to use a lie — not a warrant — to obtain entry to a residence.

The government minimizes *Pagan-Gonzales* and *Montes-Reyes* by noting that they are not from the Seventh Circuit. True, but that doesn't make them any less persuasive. The fact pattern raised here is not common, so that makes *Pagan-Gonzales* helpful both specifically and as a broad survey of relevant cases. *Montes-Reyes* becomes even more instructive because the facts there are on all fours with Hernandez-Pineda. It is not mandatory authority, but *Montes-Reyes* gives the court a strong blueprint to follow.

Law enforcement lied to Hernandez-Pineda to get his consent to enter. They stated as much in testimony. *See, e.g.*, Evid. Hrg. Transcr. at 89-90 ("Q: "A ruse is another word for a lie; right?" A: (Beckman): "Yes.");  *See also* Evid. Hrg. Transcr. at 62 (Q: "And your goal with using the ruse about E.V. was to persuade Mr. Hernandez-Pineda to let you into the apartment, right? A: (Ronsman): To gain consent, yes." Specifically, and shamefully, they told Hernandez-Pineda that they were searching for E.V., an actual missing three-year-old boy. They made an

operational plan to use a ruse to obtain consent to enter and search:

> Q: And that was your operational plan, to use that child's name to get into an apartment?
> A: That was the – the operational plan that was constructed by Special Agent Beckman, yes.

Evid. Hrg. Transcr. Page 56 (Ronsman). Officer Beckman testified the same way:

> Q: You told him the story about E.V. to get his consent to go into the apartment?
> A: Yes. At that point when we approached him that was the goal to try and gain consent for the vehicle and the apartment that he was living in.

Evid. Hrg. Transcr. page 90 – 91 (Beckman)

Less euphemistically, they chose to lie on purpose. They chose specifically to take an actual tragedy and turn it to their advantage, hoping to gain consent to enter so they wouldn't need a warrant.

The government argues that law enforcement did not intend to convey any sense of emergency. If so, then why use a lie about an actual missing three-year old child? If it was a lie about a missing cat, the government's argument might be stronger. But a lie about an actual missing three-year-old child automatically conveys urgency.[4] Law enforcement made clear that they had to do this quickly because it was a missing child. The video record is peppered with

---

[4] And this particular and actually-missing child was the topic of frequent news coverage. *See* Evid. Hrg. Transcr. at 39: "Q: there was quite a bit of news coverage about it? A: Yes."

words of speed rather than words of deliberation, such as "quick," "real quick," "come on," "let's go," "get out of your hair." *See* Gov't. Exhs. 5, 6, 7, and Defendant's Exhs. 1001, 1002, 1002, all referenced below at 26-27. At the scene, which is the time that matters, Officer Beckman says that the child got kidnapped or killed three weeks ago, and that "everybody on the planet" is still looking for him. Contrary to Beckman's later testimony, those words clearly show emergency and urgency, and they worked to undermine any voluntariness of Hernandez-Pineda's consent.

**B.  Any purported consent was also the product of police officers' implied show of authority to search Hernandez-Pineda's home regardless of his consent.**

The Supreme Court has made it clear that the government cannot meet its burden of proving consent by pointing to a person's "mere acquiescence" to the police's show of purported authority to conduct a search. *See Bumper v. North Carolina*, 391 U.S. 543, 549 (1968). *Bumper* provides the relevant framework for distinguishing voluntary consent from such mere acquiescence. In *Bumper*, four police officers appeared at the house of a 66-year-old woman, Hattie Leath, searching for her grandson, Wayne Bumper. *Id.* at 546. One of the officers told Leath, "I have a search warrant to search your house." *Id.* Leath responded, "Go ahead," and opened the door. *Id.* Once inside, officers found evidence that was

later used against Bumper. Bumper moved to suppress that evidence, and the government responded that the search of the home was lawful because Bumper's grandmother had given her consent. The Supreme Court disagreed. The Court found that Ms. Leath's consent was not voluntary because it was given "only in submission to [an officer's] claim of lawful authority" to carry out the search. *Schneckloth*, 412 U.S. at 233, citing *Bumper* at 548-549.

Importantly, although the purported show of authority in *Bumper* was the police's claim to have a warrant, that is not the only type of false "claim of lawful authority" that may render consent involuntary. As the D.C. Circuit explained earlier this month:

> *Bumper* is, to be sure, frequently applied to situations where a person agrees to a search after officers misrepresent that they have a search warrant. *See e.g.*, *Hadley v. Williams*, 368 F.3d 747, 749 (7th Cir. 2004). But that is just one specific application of *Bumper*'s broader holding that consent is not voluntary when it is 'granted only in submission to a claim of lawful authority.' *Bustamonte*, 412 U.S. at 433, 93 S.Ct 2041 (citing *Bumper*, 391 U.S. at 548, 88 S.Ct. 1877). . . . *Bumper*'s holding is not limited to situations in which a police officer misrepresents the existence of a warrant.

*United States v. Glover*, 2025 U.S. App. LEXIS 18091 at 9 (D.C. Cir., July 22, 2025) (remanding because district court failed to properly consider whether officer's references to warrants and statements that he "needed" to search the apartment rendered the consent mere acquiescence to a claim of lawful authority). And courts

have applied *Bumper*'s holding to cases where the police falsely claim or imply lawful authority by some means other than announcing they have a warrant that does not exist.

In *Orhorhaghe v. I.N.S.*, 38 F.3d 488 (9th Cir. 1994), for example, the court found that the defendant did not voluntarily consent where agents *told* Orhorhaghe, rather than asked, "Let's go into your apartment." *Id.* at 500. Orhorhaghe "complied with this instruction and returned to his apartment, with the agents following." *Id.* At the door, Orhorhaghe asked if the agents had a warrant. The agents replied that they "didn't need a warrant to talk to him." *Id.* The agents did not claim to have a warrant to enter the apartment. Nor did they *explicitly* claim they didn't need a warrant to enter the apartment – instead, the agent claimed he didn't need a warrant to *talk* to Orhorhaghe. The statement nevertheless implied that agents had the legal authority to enter the apartment, with or without a warrant and, importantly, with or without Orhorhaghe's consent, rendering his consent involuntary. *Id.* at 500-501.

The facts are similar here. The video record of the interaction clearly shows that law enforcement were *telling* Hernandez-Pineda what to do, not *asking* him. The government's brief misses this distinction when it argues that Hernandez-Pineda voluntarily consented. The record is peppered with law

enforcement using words of command rather than words of inquiry, such as "we gotta," "we need to," we have to." Transcripts of the body cam videos were entered into evidence at the evidentiary hearing as Defense Exhibits 1001, 1002, and 1003. The videos themselves are also in the record. For example:

Defense Exhibit 1001 (Transcript of Gov't Exh. 5, Ronsman Body Cam Video) (emphasis supplied)

Page 1: Beckman: "we **need to** check…I **need to** check to make sure."

Page 2: Beckman: "we just **need to** check this place."

Page 3: Beckman: "we just **need to** get out of your hair" (also implying speed/quickness)

Page 7: Benitez: "it'll go better for you if you cooperate."

Page 8: Beckman: "We **just gotta** go look in your apartment **real quick** and we'll be out of here. **Just take us in** the apartment."

Page 8, Hernandez-Pineda: "Let me call this girl."
Beckman: "No No, we can't do that. We're not calling her. **Just take us** to the apartment **quick** and then we'll get out of here. **Let's go**."

Page 8, Hernandez-Pineda: Okay, okay.
Hernandez-Pineda. Okay, wait wait wait, umm…you…umm
Beckman: Just **come with me**. **Come on, let's go**.

Defense Exhibit 1002 (Transcript of Gov't Exh. 6, Waeghe Body Cam Video) (emphasis supplied).

Page 2, Benitez: "they **have to** check where you live."

Page 3, Benitez: "they **have their job** to do, if they searched the car, the next step is they **have to** check the house."

Defense Exhibit 1003 (Transcript of Gov't Exh. 7, Waeghe Axon Body 3 Video) (emphasis supplied).

Page 3: Beckman: "Well, he's **going to** check your car **real quick**."

Page 3: Beckman: "So **come over here** and talk to me"

Page 5: Beckman: "This, this is just for that little kid. We **gotta** get him…"

Page 3, Beckman: "Okay, well he got…well, he's probably dead, but he got kidnapped or killed three weeks ago, and so, like they're having everybody on the planet. If anybody calls in anything, they're like, you **gotta** follow up on it. Right?"

This distinction matters because it shows that Hernandez-Pineda was not presented with a choice about letting law enforcement enter. He was presented with a *fait accompli*: they *had to* do this. That's not giving Hernandez-Pineda a choice, it's telling him that the entry was going to take place one way or another. And that is precisely the kind of language that courts have found trigger mere acquiescence rather than voluntary consent. *See United States v. Cole*, 195 F.R.D. 627, 633 (N.D. Ind. 2000) ("Concerning Cole's silence or lack of resistance in the face of Trevino's statements that he 'wanted' Cole to get his identification, that the police 'needed' to see Cole's identification and that Trevino was 'going to check the front door,' the Court finds Cole's silence or lack of resistance in response to these directives to not be actions of voluntary consent but instead mere acquiescence to a show of lawful authority."); *see also Murrell v. City of Oak Creek*,

No. 23-cv-1216-SCD, 2024 U.S. Dist. LEXIS 181607, at 14 (E.D. Wis. Oct. 3, 2024) (finding no voluntary consent where officer "did not *ask* [defendant] to exit the vehicle or for permission to remove the firearm from his person" but rather "*told* [defendant] that he had to get out" by stating "'We just have to have you come out. I'll secure it, run the ID on it to make sure it's all good, and then we'll get you on your way" (emphasis in original)); *United States v. Ivory*, 56 F. Supp. 3d 953, 956 (E.D. Wis. 2014) (finding no voluntary consent where the officer "did not ask defendant if he could pat him down; rather he told defendant [that he] 'would have to pat him down' or 'need[ed] to pat him down")).

Indeed, Hernandez-Pineda's acquiescence is shown by his words and body language. Officer Beckman says "come on, let's go" and Hernandez-Pineda says "okay okay." Govt. Exh. 5 at time-stamp 16:31:20 (running time 13:43); *see also* Defense Exhibit 1001 (Transcript of Gov't Exh. 5) at 8. Hernandez-Pineda then says "wait wait wait" before turning and following Officer Beckman to the door. *Id.*

The government argues that Hernandez-Pineda "had no difficulty understanding" the conversations with law enforcement. Docket No. 22 at 22. Hernandez-Pineda disagrees with that premise as a significant overstatement of the facts. Even law enforcement didn't think Hernandez-Pineda "had no difficulty understanding" what was going on because they got a Spanish-speaking officer

on the phone. They would not have done so if Hernandez-Pineda had no difficulty understanding the conversation. In various contexts, in both English and Spanish, Hernandez-Pineda frequently says "I don't understand" or "I don't know." *See generally* Defense Exhibit 1001 at 1, 2, 4, 7.

The government further argues that Hernandez-Pineda "showed acumen" in his conversations with law enforcement, but again, that overstates the facts. Four officers show up and tell him they're looking for a missing child. That's confusing, particularly when you had nothing to do with that case. Rather than showing any acumen, Hernandez-Pineda says he doesn't understand, and he only lets the police into his apartment based on their telling him they "need to" and "have" to search for the missing child.

The officers' imperative statements that they "needed" to search the apartment and their telling Hernandez-Pineda to "just take us in" the apartment were directives, not requests. That made Hernandez-Pineda's decision to allow officers into his apartment "mere acquiescence" rather than voluntary consent.

**C. Under the totality of the circumstances, the government cannot meet its burden of proving Hernandez-Pineda's consent was voluntary.**

Ultimately, the validity of consent is determined by the totality of the circumstances. *Schneckloth*, 412 U.S. at 227. The government argues that Hernandez-Pineda's consent was voluntary. Hernandez-Pineda disagrees with

the government's factual arguments about the totality of the circumstances in several aspects. First, the government suggests that the police presence was not overwhelming as there were only a "limited number" of agents present. Docket No. 22 at 21. There were four officers and four police vehicles, making the ratio four-to-one in favor of law enforcement. That's more than enough to make it clear that law enforcement was in charge of the situation, not the defendant. Law enforcement also blocked Hernandez-Pineda's car from leaving. They eventually moved their police vehicles, but only shortly before going into the apartment.

Hernandez-Pineda also disagrees with the government's characterization that the interaction was "without agents anywhere close to him." Docket 22 at 21. While the video evidence shows that Hernandez-Pineda walked back and forth, law enforcement officers were always close by. *See, e.g.*, Govt. Exh. 7 at 16:20:18 (running time 9:22) (three officers within arm's length). Perhaps they were not two inches away during the entire interaction, but they were never far enough that the defendant was left to his own devices.

The government also argues that law enforcement returned Hernandez-Pineda's phone and keys. "Agents only held his identification and phone for a brief period before returning them, and they never seized his keys, so he could have entered the building and terminated the encounter at any time."

Docket 22 at 21. The argument that Hernandez-Pineda could have done something differently (essentially, just walk away) rather breezily sidesteps the reality of this four-to-one police encounter. It also attempts to shift the burden to Hernandez-Pineda.

As for the phone, the answer there is that it was not really returned until after the entry and search. Law enforcement told Hernandez-Pineda to stop using his phone at least four times in the parking lot. *See* Defense Exhibit 1003 (Transcript of Govt. Exh. 7) at 1 (Waeghe: "Can you hang up the phone, please. Yeah, just set it down right here."); *Id.* at 3 (Beckman: "You don't got to call anybody." Waeghe: "You can stay off the phone. Just put the phone…"); *See also* Defense Exhibit 1002 (transcript of Govt. Exhibit 6) at 4 (Beckman: "No, we don't need to talk to her."); *See also* Defense Exhibit 1001 (transcript of Govt. Exhibit 5) at 8 (Hernandez-Pineda: "let me call this girl." Beckman: "No, no, we can't do that."); *See also* Evid. Hrg. Transcr. at 85 ("Q:…there was one or two times earlier on the video where he was like on his phone and you told him to hang up the phone? A (Beckman: Yes.").

Officer Beckman took Hernandez-Pineda's phone, put it in his pocket, and then later placed it on the back of the car, not so much "returning" it to Hernandez-Pineda but keeping it where law enforcement could control it. And

given that law enforcement didn't let Hernandez-Pineda use the phone, having access to it is not of any utility. The video evidence shows Hernandez-Pineda with a phone in his hand while in his apartment with law enforcement, but this is clearly after the entry.

As for the keys, the scene was in law enforcement's control. The keys were in the car, but the car was blocked by law enforcement vehicles for much of the interaction. Additionally, for reasons of officer safety, it's unlikely that officers would have let Hernandez-Pineda enter the car and retrieve the keys on his own. The video evidence (and testimony) clearly shows the officers tossing the keys from one officer to the next so they could be given to Hernandez-Pineda to open the outer and inner doors to his apartment. Evid. Hrg. Transcr. at 98-99; *see also* Govt. Exh. 5 at time-stamp 16:31:50 (running time 14:13). That's not so much "returning" them as law enforcement recognizing that they needed the keys so Hernandez-Pineda could let them into his apartment.

All of those factors, particularly when considered in their totality, mean the government cannot meet its burden of proving that Hernandez-Pineda gave officers his voluntary consent to search his apartment. The evidence should therefore be suppressed.

## IV.    SCOPE OF CONSENT

Even if the Court were to find that Hernandez-Pineda provided his voluntary consent for the entry into and search of his apartment, suppression would still be warranted because officers exceeded the scope of any such consent.

In *United States v. Dichiarinte*, 445 F.2d 126 (7th Cir. 1971), law enforcement had an arrest warrant for the defendant on a narcotics charge. They obtained consent to enter the defendant's residence on that basis (to search for narcotics), but then searched for anything and everything, seizing documents that were used in a criminal tax prosecution. The Seventh Circuit suppressed the evidence, finding the search unreasonable and that it exceeded the scope of the defendant's consent. The Court held that "[g]overnment agents may not obtain consent to search on the representation that they intend to look only for certain specified items and subsequently use that consent as a license to conduct a general exploratory search. A consent search is reasonable only if kept within the bounds of the actual consent." *Id.* at 129.

That is exactly what happened here. Law enforcement obtained Hernandez-Pineda's consent (or his acquiescence) to enter his apartment regarding a search for a real missing child. But immediately upon entry, they began to search for controlled substances, not a missing child. They clearly and

objectively had no intention to look for E.V. in the first place because they were investigating drugs and searching for drugs. But Hernandez-Pineda's consent was to look for the child. *Dichiarinte* is from this Circuit and is on point regarding law enforcement not being able to broaden the search beyond the subject of the consent.

State courts have also held similarly. *Redmond v. State*, 213 Md. App. 163 (Court of Special Appeals of Maryland 2013). In *Redmond*, a police detective told the defendant that he was looking for a fictitious pedophile who was wanted for child molestation. In reality, the detective was searching for a stolen cell phone. The court in *Redmond*, citing both state and federal cases, held that consent given under such a ruse was not freely given. *Id.* at 184-190 (collecting cases). The court in *Redmond* also held that the police in that case also exceeded the scope of consent, noting that the scope of a search is generally defined by its expressed object. "The nature of the ruse informs the analysis of whether the police exceeded the scope of the consent that was given." *Id.* at 188.

The entire ruse from law enforcement was that we need to look for this kid. Officer Beckman even crudely says "is there a dead kid in there?" Defense Exhibit 1001 (Transcript of Govt. Exh 5) at 1. That was their focus, and that was the reason that Hernandez-Pineda consented or acquiesced to entry. The

government's attempt to extend the scope of Hernandez-Pineda's consent to entry to search for a missing child into consent to search for anything is unavailing.

The government's brief ascribes to Hernandez-Pineda a level of independence and language skill that is not realistic or supported by the facts. Hernandez-Pineda was not born in the United States and English is not his first language. The government's arguments assume the defendant's facility with English and imply that the conversation between Hernandez-Pineda and law enforcement was seamless and clear. It may be a matter of argument, but in Hernandez-Pineda's attorney's view, the conversations at the scene were hardly models of clarity. The communication between Hernandez-Pineda and law enforcement was far from ideal, on both ends. Law enforcement officers interrupt Hernandez-Pineda, talk over him and past him, and don't get an interpreter until well into the interaction.

The government draws far too much from Hernandez-Pineda's responses, giving him the ability to choose his words as if he were an appellate attorney trying to avoid waiver. For example, the government parses one of Hernandez-Pineda's responses to broaden consent beyond a search for a missing child. Docket 22 at 12. Hernandez-Pineda understands that the police are looking for a missing child: "Yes, that's what they're telling me." Exh. 1001 at 4; Exh. 1002

at 2-3. The government points to Officer Benitez's testimony to argue that Hernandez-Pineda consented to a search for everything because Officer Benitez told Hernandez-Pineda that police had "to check/look at everything to make sure everything checks out." Exh. 1001 at 4-5. That's far too broad of a characterization to hold water. Hernandez-Pineda is being told a lie about law enforcement's urgent need to search for a missing child, so it's clear that that is what any arguable consent is for. His consent obviously means to look where a missing child could be. Hernandez-Pineda isn't a lawyer, he's an average guy. Ascribing such weight and intent to "everything" balloons Hernandez-Pineda's consent far beyond any normal scope or intent of his words. Common sense is strong — if the cops tell you they're looking for a missing child, that's what they want to look for. They want to make sure "everything checks out," *i.e.*, that the kid is not there. If there were any consent given, that's what Hernandez-Pineda consented to, not a general search for everything.

Law enforcement's motivations matter too. Looking for a missing child was a lie. A missing child was never their reason for talking to Hernandez-Pineda, and searching his apartment for a missing child was never their goal. It was a lie designed to get them inside where they could search for drugs. *Dichiarinte* says you can't get consent to look for A but then look for B instead. That's what

happened here, and it was not by luck but by specific design on the part of law enforcement.

The government's attempts to distinguish *Dichiarinte* are unconvincing. The government argues that the police were already inside and that the evidence was in plain view so *Dichiarinte* wouldn't apply. The government's brief is confusing on this point, correctly noting that the evidence was found in a closet but also arguing that "these items were in plain view." Docket No. 22 at 25. But the drugs and gun were not in plain view; the evidence was in a closet, found inside a box and a duffel bag. Officer Beckman testified that he opened a bi-fold closet door, found a box, opened it, and cocaine was inside. Evid. Hrg. Transc. at 87.

The government also tries to elide *Dichiarinte* entirely by arguing that Hernandez-Pineda expanded the scope of consent during the search itself. This puts the cart before the horse. The scope of Hernandez-Pineda's consent is based on the lie he was told in the parking lot. As soon as Hernandez-Pineda opens the door to his apartment, law enforcement immediately searches for more than a missing child and in places where a missing child would not be found. Govt. Exh. 5 (Ronsman body cam video) at 16:32:25 (running time 14:47); *see also* Evid. Hrg. Transcr. at 52 ("Q: when you went into the bedroom, did you start searching

anywhere in particular? A: (Ronsman) Yeah. I went to the dresser first, and then I believe I moved over to the closet."). Hernandez-Pineda's later consent (or acquiescence) to what law enforcement is already doing does not cure any of the initial constitutional defects.

The facts for Hernandez-Pineda are actually stronger than those that resulted in suppression in *Dichiarinte*. In that case, law enforcement actually had an arrest warrant. Law enforcement here had no such thing; rather, what they had was an intentional "operational plan" to avoid the Fourth Amendment and lie their way into the apartment. The facts for Hernandez-Pineda are stronger (and, frankly, much more objectionable) than those that resulted in suppression in *Dichiarinte*.

The court in *Dichiarinte* also reminds us that the Fourth Amendment requires a warrant in order to protect against unreasonable searches. Citing both the Supreme Court and Seventh Circuit precedent, the *Dichiarinte* court takes a dim view of law enforcement trying to get around the Fourth Amendment:

> "Courts have not looked with favor on the practice of substituting consent for the authorization of a search warrant. The Supreme Court, in *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889 (1968), stated that 'police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure.' This court, in *United States v. Arrington*, 215 F.2d 630, 637 (7th Cir. 1954), said: 'It is high

time that courts place their stamp of disapproval upon this increasing practice of federal officers searching a home without a warrant on the theory of consent, particularly where no reason is shown why a search warrant was not obtained.' The Court of Appeals for the Sixth Circuit expressed a similar sentiment in *Catalanotte v. United States*, 208 F.2d 264, 268 (6th Cir. 1953): 'We have noted with disapproval the growing tendency on the part of police officers to be very quick on the trigger in construing — and acting upon their construction — a statement of some known offender as an invitation to search his premises.'"

*Dichiarinte,* 445 F.2d 126 at 129, n.1. Hernandez-Pineda's case should be the vehicle to again remind law enforcement of the Fourth Amendment's warrant requirement, and should also be the case to place a stamp of strongest disapproval on the intentional tactics used here.

## V.    PUBLIC POLICY

The ultimate touchstone of the Fourth Amendment remains reasonableness. *United States v. Banks*, 60 F.4th 386, 389 (7th Cir. 2023). It bears making clear: law enforcement's actions here were anything but reasonable. Officers lied to Hernandez-Pineda in order to gain his consent. Whether you euphemistically call it an "operation" or a "ruse" or whether you call it by its true name — a lie — law enforcement did this on purpose. But they didn't need to lie. There was nothing about this investigation that compelled them to do what they

did. There was no exigency, no need for speed, no danger, nothing that compelled (or should allow) law enforcement to dispense with getting a warrant.

Instead, the law enforcement officers lied to intentionally circumvent one of the most fundamental protections of the Fourth Amendment – the requirement that police get a warrant before encroaching on the sanctity of the home. They deliberately made a plan, not to apply for a warrant, but to lie to get consent so they wouldn't have to, likely because that was easier than abiding by the basic demands of our Constitution. The Supreme Court has warned against this kind of purposeful gamesmanship in the context of *Miranda*, stating that "strategists dedicated to draining the substance" out of a constitutional protection cannot accomplish their purposes by planning a way around that protection. *Missouri v. Seibert*, 542 U.S. 600, 617 (2004).

To make things worse, law enforcement didn't just lie, they deliberately chose to use the name of a real missing child, exploiting an actual tragedy for their own expedient ends. Leaving aside the dozens of pages of arguments above, permitting law enforcement to purposely and purposefully lie in this way is contrary not only to the Constitution but contrary to public policy as well.

Cases and commenters for years have noted that these kinds of strategies breed cynicism and erode public trust. When law enforcement officers (not undercover, but wearing gear emblazoned with the word "POLICE") use a distasteful falsehood to gain entry to a residence, why would (or should) people trust them in the future when they might really be looking for a missing child?

As the First Circuit has rightly noted, "[b]eyond the coercion inherent in the false emergency scenario, multiple courts have emphasized 'the potential public policy hazard created when police officers make false claims of exigent circumstances.'" *Pagan-Gonzales*, 919 F.3d at 595, citing *Montes-Reyes*, 547 F. Supp. 2d at 288 n.10); *see also Krause*, 206 S.W.3d at 926 (stating that, if the court sanctioned the ruse of a false report of young girl's rape, "citizens would be discouraged from 'aiding to the utmost of their ability in the apprehension of criminals' since they would have no way of knowing whether their assistance was being called upon for the public good or for the purpose of incriminating them" (quoting *Schneckloth*, 412 U.S. at 243))".

Put simply, it is unreasonable and contrary to public policy to allow law enforcement to obtain by strategy what the Fourth Amendment requires a warrant to produce. Allowing this kind of behavior breeds cynicism and distrust, not only of police but of the Constitution.

## VI. CONCLUSION

The test for valid consent is totality of the circumstances. At the risk of being obvious, that means that the Court can take everything into consideration, Citing LaFave, the First Circuit in *Pagan-Gonzales* calls this a murky area where it is difficult to draw bright line rules. *Pagan-Gonzales,* 919 F.3d at 596. But counsel for Hernandez-Pineda doesn't think this case is murky at all. It's crystal clear: using this type of lie to get consent and evade the Fourth Amendment is wrong and unconstitutional, and all evidence derived from use of this tactic here should be suppressed. Callously exploiting a real tragedy for a temporary and expedient law enforcement benefit vitiates any consent.

THEREFORE, on the above grounds, counsel for Hernandez-Pineda respectfully requests the Court suppress the evidence seized by law enforcement and all fruits thereof.

Dated at Green Bay, Wisconsin, this 1st day of August, 2025.

Respectfully submitted,
**s/ Tom Phillip**
Tom Phillip, Bar #1023113
Attorney for Jose Angel Hernandez-Pineda
Federal Defender Services of Wisconsin, Inc.
801 E. Walnut Street, Second Floor
Green Bay, Wisconsin 54301-4401
Tel: 920-430-9900
tom_phillip@fd.org

N:\Cases-Open\G-H\Hernandez-Pineda, Jose Angel - 25-048\Pre-trial\Briefing on Motion\Def Response FINAL.docx

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.