UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

          Plaintiff,

v.                                               Case No. 25-CR-064

JOSE ANGEL HERNANDEZ-PINEDA,

          Defendant.

**GOVERNMENT'S REPLY TO
DEFENDANT'S RESPONSE ON SUPPRESSION MOTION**

The United States of America, by its attorneys, Richard G. Frohling, Acting United States Attorney for the Eastern District of Wisconsin, and Timothy W. Funnell, Assistant United States Attorney, hereby replies to Hernandez-Pineda's response. (Dkt. 23). For the following reasons, and those stated in the government's brief, (Dkt. 22), the motion to suppress should be denied.

**I.**     **Argument**

        **A.**     **Hernandez-Pineda has not met his "almost impossible" burden**

As the Seventh Circuit has held repeatedly, Hernandez-Pineda's failure to testify or submit an affidavit makes it "almost impossible" for this Court to find that he met his burden of proving a personal, constitutionally protected privacy interest. (See Dkt. 22 at 15 (collecting cases).) That standard controls the outcome here, but Hernandez-Pineda—who must overcome it—fails to even mention it in his response.

He attempts to distinguish four cases—*United States v. Ruth*, 65 F.3d 599, 605 (7th Cir. 1995), *United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006), *United States v. Amaral-*

*Estrada*, 509 F.3d 820, 827 (7th Cir. 2007), *United States v. Carlisle*, 614 F.3d 750, 757 (7th Cir. 2010)—because they "involve garages, cars, and backpacks" rather than an apartment. (Dkt. 23 at 12.) But he points to no discussion or principled basis in those cases or others, and the government knows of none, that this distinction makes any difference under the expectation-of-privacy analysis. It does not. A defendant asserting a privacy interest has the same burden, whether he's challenging the search of a residence, car, or another location or object. See *United States v. Dixon*, 137 F.4th 592, 601-02 (7th Cir. 2025) (applying the "almost impossible" standard to challenged searches of a house, two cars, a phone, and a duffel bag).

He says that it's "curious" for the government to cite *Dixon*, where both parties failed to submit any evidence, while, as he contends, the record here is "replete with facts" that prove standing. (Dkt. 23 at 6.). Both assertions are wrong. *Dixon* is relevant for several reasons, including, as indicated above, its recitation of the nearly impossible burden that Hernandez-Pineda faces having failed to testify about his subjective expectation of privacy. *Dixon* also reinforces that standing is not a mere technicality, but a substantive issue under the Fourth Amendment. Adhering to its principles, therefore, does not—as Hernandez-Pineda contends—"elevate form over substance" or "distract from the thrust of the motion to suppress." (Dkt. 23 at 4.) *Dixon* is but one of many cases illustrating the issue's significance, where a defendant's failure to submit evidence on his subjective expectation of privacy was dispositive in affirming denial of suppression. 137 F.4th at 601-02.

*Dixon* also highlights that a defendant may testify about suppression issues without his testimony being used as direct evidence of guilt at trial. *Id.* at 602. In making this tactical decision not to testify, a defendant (like Hernandez-Pineda did here) can weigh whether he has beneficial testimony to offer, if at all, against his willingness to undergo cross examination about his contradictory statements and conduct that are relevant to the contested issues. It is a calculated

risk, because it leaves unanswered factual questions that cannot be answered through argument. See *Dixon*, 137 F.4d at 602-03 (rejecting Dixon's "conclusory assertion" in lieu of his testimony, affidavit, or "any other evidence regarding his subjective expectation of privacy," and rejecting Dixon's reliance on the government's arguments, which are a "litigating position, not evidence").) Equally plausible inferences are not enough for a defendant to meet his nearly impossible burden. Hernandez-Pineda could have been questioned about several relevant issues, including his denials of living there. If he recanted those denials on the stand, that would mean that he lied to agents at the time, showing his understanding of English and his shrewdness in dealing with law enforcement. He could have been questioned about how he understood English well enough to converse with agents about searching the car, to which he consented, and when the topic switched to the apartment, he suddenly asked for a translator. He could have been asked when and how he obtained the key, and why he had it—whether it was based solely on his drug-dealing connection to J.P.C. and need to access more cocaine (recall that under J.P.C.'s lease, residential purposes were the only permitted use). Also, whether anyone else had a key; his expectation about his and others' ability to access the apartment and its contents; whether he could control others in that regard; what he and others could keep there and when; who was permitted to sleep there, and who made those decisions; whether he actually lived there at the time of the traffic stop in January 2024 or was simply providing an address that he could recall based on his connection to J.P.C.; and other topics. Hernandez-Pineda chose not to face these questions under oath, and he likewise failed to supply the answers through anyone else with sufficient personal knowledge, like perhaps J.P.C., J.P.C.'s landlord, or his girlfriend.

Critically, *Dixon* also repeated this circuit's holdings that a defendant's "statements of disassociation" from the place or object that was searched "can indeed support a district court's finding that a defendant lacks standing to challenge a search." *Id.* at 603-04 (collecting cases).

Again, it is undisputed that Hernandez-Pineda was not on the lease to Apartment 14, and that when he spoke to agents on the day of the search, *he repeatedly denied living there*, saying he was looking for his nephew. Now, having avoided cross examination on these statements and other topics, his counsel tries to brush these highly relevant statements of disassociation as simply "weak denials" that agents didn't believe, so the Court should disregard them in its expectation-of-privacy analysis. (Dkt. 23 at 11, 13.) But again, counsel's arguments are not an evidentiary proxy. See *Dixon*, 137 F.4d at 602-03. And even when a defendant denies that he's connected to a place or object despite officers witnessing it firsthand, the cases show that those presumably false statements of disassociation are still just as relevant to the expectation-of-privacy question. (See Dkt. 22 at 16 (citing *Amaral-Estrada*, 509 F.3d at 827).) Nor is it accurate to describe Hernandez-Pineda's denials as "weak." He made them in real time, at the scene, more than once, in English and in Spanish. The bodycams show that he understood agents when they asked him about searching the car and the apartment, and that he consented to the search of the car, which he doesn't challenge, despite officers obtaining his keys and a knotted corner baggie from inside. The bodycams also show that when the subject quickly turned from the car to the apartment, he denied living there and said that he was only there to fetch his nephew. He repeated this unequivocal denial several minutes later to TFO Benitez in Spanish. (See Dkt. 22 at 8-11.)

Hernandez-Pineda contends that in January 2024, when he told a different officer during a traffic stop months that he lived at Apartment 14—the opposite of what he said on the day of the search—the Court should find the earlier statement more compelling because agents "relied upon it on the day of the events." (Dkt. 23 at 14.) In other words, rather than providing sworn testimony where he's subject to cross examination, he expects that the Court will rely on his self-contradictory, out-of-court statements. This demonstrates the important role served by the "almost

impossible" standard, which comes into play when a defendant refuses to testify about his own subjective expectations of privacy.

It is not compelling evidence of his subjective expectation of privacy that he changed jackets during the search, that the doors were locked, that he had a key and didn't "fumble" with it, and that his passport and identification were inside. (Dkt. 23 at 8, 10.) Again, he provided no testimony on these ostensibly critical facts, depriving the government of cross-examination and the Court of context and witnessing his demeanor on the stand to assess them. It's true that passports and other photo IDs are important, but we don't know when he put them there and why. Perhaps it was more convenient and safer than alternative locations. After all, that's where he kept his cocaine and pistol. Keeping items there, for an unknown period, and for unknown reasons, does not meet his nearly impossible burden of showing his personal, subjective expectations. Considering that he had just dropped off J.P.C. after they returned from Chicago where they were suspected of bulk-cash smuggling, that agents had reliable evidence that J.P.C. was a known cocaine distributor, and that Hernandez-Pineda had just accessed the apartment—where the cocaine was kept—in order to immediately drive to JBS for a suspected hand-to-hand drug delivery, it's not surprising or dispositive that he had a key. Having a commercial purpose to enter an apartment does not show overnight-guest status, nor does it supply answers to the other questions detailed above. As to the locked doors, it is common for an apartment building's outer doors to lock automatically, just as this one appeared to be when they all approached it. It is also common for tenants to keep their own doors locked, either automatically or manually. It is speculation to find that the locked doors resulted from the subjective, affirmative steps of Hernandez-Pineda to restrict access and keep others out because he offered no testimony about it. As for the jacket, taking it off and putting it on are easy to do; it is not the equivalent of "chang[ing] your clothes." (Dkt. 23 at 16.) We don't know whether it belonged to him, J.P.C., or someone

else—again, because he didn't testify—and there's no evidence as to how agents would have known it definitively either. Even if we assume that it was his, keeping a jacket at an apartment is not compelling evidence of overnight-guest status, especially when Hernandez-Pineda denied living there and had a commercial purpose to have a key.

As to his signature on the consent form, and his statements to agents about where he lived and didn't live, it is irrelevant whether agents "believed" Hernandez-Pineda or not; what matters for Fourth Amendment purposes is Hernandez-Pineda's "subjective intent *and* his actions that manifest that intent." (Dkt. 22 at 15 (citing *United States v. Ruth*, 65 F.3d 599, 605 (7th Cir. 1995) (emphasis added).) In other words, he must produce evidence of *his subjective intent and his corroborative actions that show it*. At best, agents can testify to some of his actions, but they cannot testify to his subjective intent. His counsel recognized this when making a successful objection to whether SA Beckman "believed" that Hernandez-Pineda understood their conversation in English. (Dkt. 19 at 79 (sustaining counsel's objection "that this witness can testify what this defendant understood or believed").) Similarly, Hernandez-Pineda produced no evidence that during the traffic stop in January 2024, officers took steps to verify that he lived at Apartment 14. The stop occurred almost three months before the search, and his residence—wherever it was in January—could have changed by March. J.P.C.'s lease for Apartment 14 required J.P.C. to get permission for anyone else to reside there for more than three days. That period had long since expired between the January stop and the March search. Perhaps Hernandez-Pineda was an overnight guest in March, but the Court can only speculate about it, since neither he, J.P.C., or anyone else testified on the issue.

He also argues that his "reluctance" to let agents inside and asking them for "an order to check" shows "his" expectation of privacy. (Dkt. 23 at 12.) If hesitation was enough to meet a defendant's nearly impossible burden, it would render the standard meaningless. Not only that, but

his question about whether agents had an "order" wasn't based on his own connection to the apartment because he denied living there. Instead, it was based on his hesitance about someone else's privacy interest. (See Dkt. 22 at 12 (quoting Hernandez-Pineda: "But do they have an order to check, because I don't understand . . . I don't live here; I just came looking for/to pick up my nephew").)

For these reasons, and those in the government's brief, the Court should find that Hernandez-Pineda has not met his nearly impossible burden to prove a subjective expectation of privacy in Apartment 14.

### B. Alternatively, Hernandez-Pineda consented to the apartment search without placing limits on its scope, just as he consented to the comprehensive search of the Audi

Hernandez-Pineda does not claim that he was illegally seized, conceding that the encounter in the parking lot was consensual and not the equivalent of an arrest or detention. He also does not challenge the search of the Audi, which was done by his consent, and where agents retrieved his keys and a knotted corner baggie, so there is no allegation that it tainted the apartment search. Notably, his consent to search the Audi was given when he was speaking to agents in the parking lot, in English, about the missing-child investigation—*before* TFO Benitez was called to provide translation. Thus, the record proves that he understood agents' questions and statements, that his will was not overborne by any sense of emergency, and that he knew that he was being *asked* for consent—not *told* what to do.

Hernandez-Pineda says that "the scene was in law enforcement's control" and agents were "in charge of the situation." (Dkt. 23 at 30, 32.) The government agrees that agents retained some level of control for their safety, but as the record proves and Hernandez-Pineda concedes, it was nonetheless a consensual encounter where he was not arrested, handcuffed, or detained. An agent's

car was positioned behind the Audi, but the keys to the Audi and the apartment remained inside the car. He walked around on his own, at times close to agents and other times some distance away. He gave his identification to agents, but they gave it back within a few minutes, and his phone was sitting atop the Audi's trunk much of the time, including when he grabbed it just before taking agents inside the apartment. (His other phone remained inside the Audi.) He could have terminated the consensual encounter, grabbed his phone and the keys, and walked inside the apartment building just as he had apparently planned to do when he pulled up and parked in the first place. He never did so, nor did he tell agents that he wanted to do so. When he started talking to TFO Benitez on the phone, the "situation" remained just as calm and conversational as it had been, and if anything, was more accommodating to Hernandez-Pineda because of the precautionary step of getting a translator.

Having given agents consent to search the Audi, and having watched them search it, he knew that they were asking for his *additional consent* to search the apartment. Thus, he knew that consenting to search the car did not mean that he had to consent to search the apartment. He argues that agents were telling him what they planned to do, not asking him, but that's not supported by the evidence, rendering his cited cases irrelevant. (See Dkt. 23 at 27-28.) Throughout the encounter in the parking lot, agents made it clear—both in English and in Spanish—that they were seeking his consent to search the car and the apartment, not that they were going to search regardless of what he said. That was the entire point of approaching and talking to him, keeping the encounter consensual, taking sufficient time to make sure he understood, and getting TFO Benitez on the phone. He argues that agents used terms like they "needed" to search his apartment, (Dkt. 23 at 3), but that's not inherently coercive language, especially when agents' tone and conduct demonstrated that they were seeking his cooperation, not commanding him to do anything.

8

He cites *Bumper v. North Carolina*, 391 U.S. 543 (1968) for the principle that consent is not valid when obtained through "mere acquiescence" to the police's show of authority. (Dkt. 23 at 23.) But *Bumper* rested on significantly different facts. There, four officers showed up to Bumper's front door and announced that they had a search warrant, despite never producing it at the time and declining to rely on its existence at the ensuing evidentiary hearing. Under those circumstances, Bumper's "consent" was the product of coercion, where an "officer claim[ed] authority to search a home under a warrant," and "announce[d] in effect that the occupant ha[d] no right to resist the search." 391 U.S. at 550. Those facts, and *Bumper*'s holding, have no application here, where agents never claimed to have a warrant or any other "colorably lawful" authority to enter the apartment. See *id.*

He also cites *United States v. Glover*, 2025 WL 2055751 (D.C. Cir. July 22, 2025), but like *Bumper*, *Glover* is materially distinguishable. Officers in *Glover* had an arrest warrant for Brewer's brothers, not a search warrant, but they obtained Brewer's "consent" to enter and search her apartment by claiming to have "warrants" and saying they "need[ed]" to search. The district court denied suppression, but the circuit court reversed and remanded. It held that the "compounded effect" of officers' ambiguous references to a "warrant" and "needing" to enter and search could—under *Bumper*—constitute acquiescence to lawful authority. And since the district court had read *Bumper* narrowly and failed to find whether this invalidated Brewer's consent, remand was necessary. *Glover*'s rationale and holding do not apply here because agents did not claim to have authority to enter the apartment, but rather, were seeking consent.

Likewise, Hernandez-Pineda finds no support in *Orhorhaghe v. I.N.S.*, 38 F.3d 488 (9th Cir. 1994), an out-of-circuit immigration case where the Ninth Circuit found a Fourth Amendment violation. There, agents showed up in the apartment lobby and told Orhorhaghe, "Let's go into your apartment." At the apartment's doorway, when he asked agents if they had a "warrant," they

9

said that they "didn't need a warrant to talk to him." An agent then asked, "somewhat redundantly," if they could come in, and Orhorhaghe said, "come in." *Id.* at 491. The circuit court determined that first, agents "seized" Orhorhaghe without a lawful basis before entering the apartment, and second, they made a warrantless entry without voluntary consent. *Id.* at 493-94. Much of the opinion recounts the reasons for finding the seizure unlawful, a claim that Hernandez-Pineda does not make here. As to the finding of non-consent, it hinged on facts not presented here, namely, that Orhorhaghe asked agents if they "had the authority to *enter his apartment*" while they denied needing "authority to *talk* to him." *Id.* at 500 (emphasis in original). This phrasing, said the court, was linked to a claim of authority, and equivalent to an "assertion of an independent right" to enter, vitiating any consent. *Id.* at 500-01. Here, agents made no claim of authority.

As to the scope of consent, the government relies on its brief, (Dkt. 22 at 24-25), with the following points of emphasis. First, Hernandez-Pineda's response ignores that under *United States v. Jones*, "[t]he burden is on the individual to limit the scope of consent" before or during the search, and if the "attempt to withdraw consent is equivocal, police officers may reasonably continue their search in the premises entered pursuant to the initial grant of authority." 22 F.4th 667, 678-79 (7th Cir. 2022) (cleaned up). Second, and relatedly, Hernandez-Pineda watched as agents comprehensively searched the Audi's passenger compartment and trunk over the course of several minutes. This made it abundantly clear that they were not simply looking for a child's body, but for any evidence related to the missing-child investigation. Agents used the same, non-restrictive language in seeking consent for the apartment, so he understood the apartment search would be equally comprehensive. It was his burden to limit the scope, and he placed no limitations on it, before or during the search, including after agents found the drugs and asked if more drugs were present. (Cf. Dkt. 22 at 25 (citing *United States v. Dichiarinte*, 445 F.2d 126 (7th Cir. 1971), where defendant showed that he limited the scope of consent where agents had asked to search for

drugs and when they started looking papers, defendant asked, "Does that look like narcotics if that is what you want to search for?", and announced, "The search is over. I am calling off the search.").)

### C. The Court should apply settled Fourth Amendment law to determine the disputed issues; there is no authority to apply Hernandez-Pineda's resort to "public policy"

Finally, Hernandez-Pineda argues for suppression based on "public policy." (Dkt. 23 at 39.) He argues that agents didn't need to lie about a missing child, which he calls unnecessary and exploitative of an actual tragedy. (Id. at 39-40.) However, he cites no authority where a court ordered suppression on this basis; instead, he crafts it from the Fourth Amendment's touchstone of reasonableness, coupled with potential for "these strategies [to] breed cynicism and erode public trust," and he cites cases—like *Pagan-Gonzalez v. Moreno*, 919 F.3d 582, 593-94 (1st Cir. 2019)—where courts analyzed whether consent is vitiated by law-enforcement deception. (Id. at 39-41.)

There is no need or authority for this Court to engage in Hernandez-Pineda's resort to "public policy." The disputed issues should be decided by applying settled, authoritative cases that instruct district courts on applicable Fourth Amendment standards to find whether a defendant has shown an expectation of privacy, whether the government has proven that a defendant consented, and whether the defendant limited the scope of his consent. (See Dkt. 23 at 14-19 (expectation of privacy), 20-24 (consent and scope of consent).)

The government will not repeat those arguments here, but a brief discussion of *Pagan-Gonzalez* is appropriate since Hernandez-Pineda cited it in support of his public-policy claim. As the government's brief discussed, (Dkt. 22 at 23), *Pagan-Gonzalez* was a *Bivens* action where the First Circuit surveyed the cases and observed that it was "beyond debate that deception is a well-established and acceptable tool of law enforcement," and "despite the broadly framed objections of courts [citing none in the Seventh Circuit] to deception by known government agents, the

general consensus in the case law is that such deception, including lying about the purpose of an investigation, is not categorically off-limits in obtaining consent to search." 919 F.3d at 593-94. The court noted two exceptions to the consensus: when officers falsely claim authority that they lack, for instance, by saying they have a warrant; and when officers implicitly coerce consent by falsely present[ing] a need for urgent action," like falsely implying a bomb was planted there, lying about a gas leak, or fabricating a "grave emergency" about a missing girl. *Id.* (cleaned up).

Having made those observations, *Pagan-Gonzalez* did not recite or create a "public policy" approach to examining law-enforcement deception. Rather, it adhered to longstanding principles of voluntary consent and whether the deception vitiated it. The same approach must be followed here. There is simply no authority for a court to grant suppression based on Hernandez-Pineda's framing of "public policy."

## **Conclusion**

For the foregoing reasons, and those stated in the government's initial brief, Hernandez-Pineda's motion to suppress should be denied.

Respectfully submitted on August 8, 2025,

/s Timothy W. Funnell
TIMOTHY W. FUNNELL
Assistant U.S. Attorney
WI Bar No. 1022716
United States Attorney's Office
Eastern District of Wisconsin
Green Bay Division
205 Doty Street, Suite 301
Green Bay, WI 54301
Tim.Funnell@usdoj.gov